# EXHIBIT B

Westlaw.

Not Reported in F.Supp.  
1991 WL 315487 (D.Mont.)  
**(Cite as: 1991 WL 315487 (D.Mont.))**

Page 1

**H**  
Only the Westlaw citation is currently available.

United States District Court, D. Montana,  
Billings Division.  
Dick EGGAR, Ray Ellision, H. Jerome Claar, Ben Mar, Maynard Young, Donald Doll,  
Plaintiffs,  
v.  
BURLINGTON NORTHERN RAILROAD CO.,  
Defendant.  
**Nos. CV 89-159-BLG-JFB, CV 89-170-BLG-JFB, CV 89-179-BLG-JFB, CV 89-181-BLG-JFB, CV 89-236-BLG-JFB and CV 89-291-BLG-JFB.**

Dec. 18, 1991.

MEMORANDUM AND ORDER

BATTIN, Senior District Judge.

*1 Pending before this Court is defendant Burlington Northern Railroad Company's Motion for Summary Judgment. The Court has carefully considered the briefs and oral arguments of counsel with respect to the pending motion, as well as the supporting materials submitted by the parties. For the reasons set forth below defendant's motion is granted.

*INTRODUCTION*  
This case is a toxic tort case in a Federal Employers Liability Act ("FELA") setting. Originally, twenty-seven plaintiffs filed suit against Burlington Northern claiming that they suffer from various illnesses and conditions as a result of exposure to chemicals at Burlington Northern's Livingston shop. [FN1] In the interest of judicial efficiency and to reduce the cost and complexity of the litigation, the Court issued a Case Management Order on February 26, 1990, consolidating the twenty-seven cases for pretrial purposes. [FN2] Thereafter, on March 6, 1991, the Court selected six test plaintiffs from the parties' lists of proposed test plaintiffs. *See* Court Order dated March 6, 1991. The Court then stayed all discovery and other pretrial preparation in the remaining non-test cases, pending resolution of the six test cases. *See* Court Order dated March 18, 1991. Defendant now moves for summary judgment *only* as to the six test plaintiffs. *See* Court Order dated September 5, 1991.

*DISCUSSION*  
Federal Jurisdiction in this case is premised upon the Federal Employers Liability Act ("FELA"), Title 45 U.S.C. § 51 et seq. and Title 28 U.S.C. § 1331. Before commencing discussion of the substantive issues involved, the Court deems it appropriate to review the standards applicable to this and other summary judgment motions.

Rule 56(c), Fed.R.Civ.P., provides that summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

The burden of proof initially falls upon the moving party to identify those portions of the documents on file which it believes establish the absence of material facts. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987). There is "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Celotex Corp. v. Catrett,* 477 U.S 317, 323 (1986).

If the moving party demonstrates the absence of material facts, the burden then shifts to the party opposing summary judgment to "set forth specific facts showing that there is a genuine issue for trial." Rule 56(e), Fed.R.Civ.P.; *see also Canada v. Blain's Helicopters, Inc.,* 831 F.2d 920, 923 (9th Cir.1987). Summary judgment is proper "after adequate time for discovery and upon motion,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1991 WL 315487 (D.Mont.)
**(Cite as: 1991 WL 315487 (D.Mont.))**

Page 2

against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial...." *Celotex,* 477 U.S. at 322 (1986).

**\*2** In the case at hand, defendant contends that the testimony of plaintiffs' experts, Dr. Hines and Dr. Nelson, on causation is inadmissable under The Federal Rules of Evidence. Therefore, defendant asserts that summary judgment should be granted because without this testimony, plaintiffs cannot prove causation, which is an essential element of the plaintiffs' cases.

Plaintiffs contend that the evidentiary standards for determining the admissability of expert testimony in FELA cases are more liberal than in non-FELA cases since the plaintiff in a FELA case need only show more than a possibility of a causal relationship between defendant's negligence and plaintiff's injury.

In the Court's view, plaintiffs seem to confuse the FELA liability standard with the evidentiary standards established by the Federal Rules of Evidence. The Court is well aware of the considerably relaxed standard of proof in FELA cases. Title 45 U.S.C. § 51 provides that a railroad may be liable for an injury suffered by an employee if the injury results "in whole or in part from the negligence" of the railroad. Thus, to state a cause of action, a plaintiff must establish that he was injured, that the railroad was negligent, and that the railroads negligence caused, in whole or in part, plaintiff's alleged injuries. The test for adequate proof of causation in a FELA case is "whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought." *Rogers v. Missouri Pac. R.R.,* 352 U.S. 500, 506 (1957) (footnote omitted). A plaintiff need not show that the employer's negligence is the sole cause but "there must be a sufficient showing (i.e., more than a possibility) that *a* causal relation existed." *Moody v. Maine Cent. R.R. Co.,* 823 F.2d 693, 695 (1st Cir.1987). *Accord, Mayhew v. Bell S.S. Co.,* 917 F.2d 961, 964 (6th Cir.1990); *Edmonds v. Illinios Cent. Gulf R.R.,* 910 F.2d 1284, 1288 (5th Cir.1990).

The relaxed FELA standard of proof must be distinguished, however, from the evidentiary standards established by The Federal Rules of Evidence for determining whether a given expert's testimony is admissible. The Federal Rules of Evidence require a Court to make a preliminary determination regarding the admissibility of evidence, and evidence in the form of expert testimony is not exempt from this requirement. *See* Rule 104(a), Fed.R.Evid. [FN3] Therefore, a Court must evaluate the proffered expert testimony and determine whether it satisfies the requirements for admissible expert testimony as set forth by The Federal Rules of Evidence and related case law.

The evidentiary standards for evaluating the admissibility of expert testimony are not modified by the relaxed standard of proof in FELA cases. After all, regardless of whether it is a FELA or non-FELA case, The Federal Rules of Evidence require that the jury be presented with reliable expert testimony that will assist the jury in understanding evidence or determining a fact in issue. *See* Rule 1101, Fed.R.Evid.; *Edmonds,* 910 F.2d at 1287 (applied evidentiary standards set forth in *Viterbo v. Dow Chem. Co.,* 826 F.2d 420 (5th Cir.1987) to expert testimony in a FELA case and determined that the expert testimony was inadmissable because there was an inadequate foundation for expert's opinion on causation).

Expert opinions that are fundamentally unsupported and speculative will not serve the purpose for which they are offered, namely to assist the jury in reaching a sound verdict. Therefore, in the instant case, the Court must evaluate the expert testimony proffered by the plaintiffs according to the guidelines provided by The Federal Rules of Evidence and related case law to determine whether it meets the requirements for admissible expert testimony.

**\*3** Rule 702, [FN4] Fed.R.Evid., allows expert testimony only when "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue...." Under Rule 703, [FN5] Fed.R.Evid., the facts or data relied upon by the expert must be "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, ..." Finally, under Rule 403, [FN6] Fed.R.Evid., the Court is permitted to exclude evidence which is otherwise relevant "if its probative value is substantially outweighed by the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
1991 WL 315487 (D.Mont.)  
**(Cite as: 1991 WL 315487 (D.Mont.))**

Page 3

danger of unfair prejudice, confusion of the issues, or misleading the jury ..." See *Christophersen v. Allied-Signal Corp.*, 939 F.2d 1106, 1110 (5th Cir.1991) [FN7] (a court must determine whether the facts and data relied upon by the expert are the type relied upon by other experts in the field, whether the expert arrived at his opinion through the use of a well-founded methodology, and whether the expert's testimony has the potential for unfair prejudice that substantially outweighs its probative value) (citing Rules 703 & 403, Fed.R.Evid., and *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923)).

"[T]he admission of expert testimony generally lies within the sound discretion of the trial court." *Burlington N., Inc. v. Boxberger*, 529 F.2d 284, 287 (9th Cir.1975). "It is for the trial court to determine, in the exercise of its discretion, whether the expert's sources of information are sufficiently reliable to warrant reception of the opinion." *Id.* (quoting *Standard Oil Co. of Cal. v. Moore*, 251 F.2d 188, 222 (9th Cir.1957)). See *Head v. Lithonia Corp.*, 881 F.2d 941, 943 (10th Cir.1989) ( Rule 703 "provides a mechanism by which the court can evaluate the trustworthiness of the underlying data on which the expert relies.") (citing *Barrel of Fun, Inc. v. State Farm Fire & Cas. Co.*, 739 F.2d 1028, 1033 (5th Cir.1984)); *Richardson v. Richardson-Merrell Inc.*, 857 F.2d 823, 829 (D.C.Cir.1988) (court must look behind an expert's opinion and scrutinize the adequacy of its foundation); *In re "Agent Orange" Prod. Liab. Litig.*, 611 F.Supp. 1223, 1243 (E.D.N.Y.1985) (a court must evaluate the proffered expert testimony to ensure that the sources of the expert's opinion are sufficiently reliable).

Generally, questions relating to the bases and sources of an expert's opinion affect the weight of the opinion, not the admissibility of the opinion. *Viterbo*, 826 F.2d at 422. However, in certain cases the basis of the expert's opinion is of such "little weight" that it would not assist a jury in reaching a sound verdict and should be excluded. *Id.* at 422. "Whether an expert's opinion has an adequate basis and whether without it an evidentiary burden has been met, are matters of law for the court to decide." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 727 F.Supp. 570, 572 (S.D.Cal.1989) (quoting *Richardson*, 857 F.2d at 829).

*4 The Court is mindful of the fact that Rule 703, "was intended to broaden the acceptable bases of expert opinion" by allowing the expert to testify on facts that are not otherwise admissable in evidence. *United States v. Various Slot Machs.*, 658 F.2d 697, 700 (9th Cir.1981) (quoting *Merit Motors, Inc. v. Chrysler Corp.*, 569 F.2d 666, 673 (D.C.Cir.1977)). However, Rule 703 was not intended "to make summary judgment impossible whenever a party has produced an expert to support its position." *Id.* (quoting *Merit Motors, Inc.*, 569 F.2d at 673). As stated by the D.C. Circuit Court,

Expert witnesses are indispensable in a case such as this. But that is not to say that the court's hands are inexorably tied, or that it must accept uncritically any sort of opinion espoused by an expert merely because his credentials render him qualified to testify.

*Richardson*, 857 F.2d at 829.

Courts in nearly every federal circuit have examined expert testimony with increasing care and have excluded unreliable or unsupported expert testimony. [FN8] The Ninth Circuit is no exception. See *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 807 (9th Cir.1988) (expert testimony excluded because expert "documented little of the basis for his conclusions;" there was "scant basis in the record" for his speculation as to damages; and "[h]is study rests on unsupported assumptions and unsound extrapolation."); *Various Slot Machs.*, 658 F.2d at 700 (court excluded expert testimony because he failed to "back up his opinion with specific facts" as required by Rule 56(e), Fed.R.Civ.P.).

Against this background, the Court now turns to the case at hand. The six test plaintiffs allege that they have been exposed to a multitude of chemicals at Burlington Northern's Livingston shop and that they suffer from a multitude of ailments due to this exposure. Since the determination of whether a given chemical can cause a particular injury is not within a layperson's common knowledge, plaintiffs have submitted the expert opinions of Dr. Hines and Dr. Nelson on the issue of causation.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
1991 WL 315487 (D.Mont.)  
**(Cite as: 1991 WL 315487 (D.Mont.))**

Page 4

It is evident from the foregoing that this Court, like other federal courts, has both a right and an obligation to scrutinize the bases of the expert medical opinions proffered by plaintiffs to ensure that they meet the requirements for admissable expert testimony. The Court has examined the affidavits of the plaintiffs' medical experts and has carefully considered the bases for their opinions. Having done so, the Court concludes, for the reasons set forth below, that Dr. Hines' and Dr. Nelson's medical opinions are inadmissible. [FN9] Without the expert testimony of Dr. Hines and Dr. Nelson, plaintiffs cannot withstand defendant's Motion for Summary Judgment because they have failed to prove an essential element of their case, namely causation. [FN10]

I. INADEQUATE AND UNRELIABLE AFFIDAVITS

Plaintiffs have had ample opportunity for discovery and development of their expert testimony regarding causation. After all, this case has been ongoing since January of 1989. Moreover, on February 26, 1990, the Court specifically ordered plaintiffs to submit affidavits of physicians on the issues of injury and causation. [FN11] *See* Case Management Order dated February 26, 1990. Plaintiffs submitted the first set of affidavits on May 21, 1990. Because Dr. Hines' and Dr. Nelson's original affidavits contained mere laundry lists of chemicals and injuries, the Court issued another Order on March 6, 1991, specifically stating:

*5 The physicians affidavit shall specify, for *each* test plaintiff, the precise injuries, illnesses or conditions suffered by that plaintiff; the particular chemical or chemicals that, in the opinion of the physician, caused each injury, illness or condition; and the *scientific and medical bases* for the physician's opinions. It will not be sufficient for the affidavit to state a "laundry list" of injuries and chemicals; each injury, illness or condition must be itemized and *specifically linked* to the chemical or chemicals believed to have caused that particular injury, condition or illness. Moreover, the statement of scientific and medical bases for the opinion shall include *specific reference to the particular scientific and/or literature forming the basis for the opinion.* (emphasis added).

In response to this Order, plaintiffs submitted the second set of affidavits, which are presently at issue. Although the affidavits have increased in length, the doctors have still failed to *specifically* link *each* injury, illness, or condition to the *specific* chemical[s] believed to have caused it. In the sections of the affidavits relating to each plaintiff, the doctors have again simply listed chemicals and injuries with cursory conclusions as to causation. [FN12] Thus, plaintiffs have had two opportunities to submit affidavits on the issues of injury and causation and have twice failed to comply with Court Orders directing them to do far more than merely list chemicals and injuries for each plaintiff.

The doctors' affidavits are over 150 pages each, yet, neither Dr. Hines nor Dr. Nelson set forth the medical and scientific bases for their opinions regarding *each* plaintiff. The doctors provide no insight as to the reasoning processes which led them to their opinions that each plaintiff's exposure to particular chemicals caused his alleged injuries.

For each plaintiff, the affidavits begin by setting forth the exposure statement of the plaintiff. Then the affidavits list the alleged injuries according to the part of the nervous system to which they relate. [FN13] Thereafter, for each plaintiff, the doctors uniformly state that there is an "adequate exposure demonstrated" by the patient "to the following chemicals: ..." Hines Aff. at 154-155; Nelson Aff. at 147, 155, 162-63, 168, 178. The chemicals are listed, and immediately following the list of chemicals is the doctor's statement that it is his opinion that "these chemicals resulted in a cumulative exposure to [plaintiff's name) in that individually they contributed and together caused his present condition ..." Hines Aff. at 154-155; Nelson Aff. at 147, 155, 162-63, 168, 178.

Despite the clear mandate of this Court to specifically link each ailment to the chemical(s) believed to have caused it, the affidavits simply list the injuries and chemicals and state in a cursory manner that the chemicals "contributed and together caused his present condition." There is absolutely no indication of which particular chemical(s) caused which particular ailments or how the dose of each chemical to which each plaintiff was exposed caused that plaintiff's alleged ailment(s). Because the doctors did not set forth their reasoning

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

processes or specifically state the medical and scientific bases for their opinions as to each plaintiff, the Court is left with nothing more substantive than that the plaintiffs were exposed to a multitude of chemicals and thereafter suffered from a multitude of ailments. *See Mid-State Fertilizer Co. v. Exchanae Nat'l Bank,* 877 F.2d 1333, 1339 (7th Cir.1989) (court refused to consider an expert affidavit on summary judgment because it presented only conclusions and failed to set forth facts, the inferential process, or a discussion of the hypothesis considered and rejected); *McGlinchy,* 845 F.2d at 806 ("in the context of a motion for summary judgment, an expert must demonstrate his competence or back up his opinion with specific facts."); *Various Slot Machs.,* 658 F.2d at 700 (expert must set forth specific facts in support of his opinion).

*6 Dr. Hines and Dr. Nelson cite many documents, studies, and articles in the General Toxicology Sections [FN14] of their affidavits, purportedly attempting to provide a basis for their opinions that exposure to the chemicals listed caused plaintiffs' many ailments. However, listing numerous articles is hardly a substitute for setting forth a reasoned, scientific analysis of how the doctors drew their conclusions from the documents, literature, and studies cited.

[P]laintiffs' experts listed numerous studies ... as a supposed basis for [their] opinions. Plaintiffs must do more, however, than just cite prior studies; they must show a demonstrably objective means of drawing their conclusions from those studies.... The mere recitation of a list of studies is not a magical incantation paving the way to the witness stand unless it is accompanied by reasoned and scientifically accepted analysis.

*Carroll v. Litton Sys., Inc.,* 1990 WL 312969, 1990 U.S.Dist. LEXIS 16,833, * 144-45 (W.D.N.C.) (magistrate's opinion adopted by District Court by Order dated 7/15/91). The Court finds Dr. Hines and Dr. Nelson's recitation of numerous documents, studies, and articles an inadequate substitute for setting forth a reasoned, scientific analysis of how they arrived at their conclusions on causation as to each plaintiff.

Even if conclusory statements as to causation together with recitation of numerous documents, studies, and articles would suffice as a substitute for setting forth a reasoned, scientific analysis, the General Toxicology Sections in the doctors' affidavits fail to provide adequate or reliable bases for their opinions. An analysis of the General Toxicology Sections of the affidavits makes it clear that the doctors did not exercise care in ensuring: (1) that toxicological bases were provided for all the conditions, illnesses or injuries alleged by each plaintiff; (2) that they read the literature cited or considered the articles to be acceptable references; and (3) that the literature cited discussed the correct chemicals and conditions.

First, the affidavits discuss many irrelevant chemicals and medical conditions, and fail to discuss a majority of the medical conditions alleged by the plaintiffs. Over 200 chemicals are discussed in each of the doctor's affidavits. *See* List of Chemicals, Ex. 17 & 18 to Defendant's Brief in Support of Summary Judgment Motion ("Def.Supp.Br.") [FN15] Yet, Dr. Hines only attributes plaintiff Ellison's alleged injuries to about sixteen of the chemicals, and Dr. Nelson attributes his test plaintiffs' injuries to approximately thirty of the chemicals. [FN16] *See* Graphic Comparison of Relevant and Irrelevant Chemicals, Ex. 19 to Def.Supp.Br. Moreover, the affidavits discuss almost 400 different medical conditions, but Dr. Hines diagnosed only about fifteen of these in plaintiff Ellison and Dr. Nelson diagnosed approximately forty-six of these in his five test plaintiffs. *See* List of Conditions Mentioned and Not Diagnosed, Ex. 20 & 21, & Graphic Comparison, Ex. 22 to Def.Supp.Br.

*7 Although nearly 400 medical conditions were discussed in the affidavits, *more than half* of the medical conditions diagnosed in the plaintiffs *were not even mentioned* by the doctors in the General Toxicology Sections. *See* List of Diagnosed Conditions & Unmentioned Conditions, Ex. 23 to Def.Supp.Br.; Graphic Comparison of Diagnosed Conditions & Unmentioned Condition, Ex. 24 to Def.Supp.Br. Further, both doctors fail to otherwise provide a toxicological basis for the unmentioned conditions in the General Toxicology Sections. Thus, the affidavits do not provide any scientific or medical support for attributing the unmentioned conditions to chemical exposure. The

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.            Page 6
1991 WL 315487 (D.Mont.)
**(Cite as: 1991 WL 315487 (D.Mont.))**

doctors' opinions that the unmentioned conditions were caused by chemical exposure are therefore speculative and unfounded. Moreover, plaintiffs have clearly failed to comply with the Court's Order of March 6, 1991, directing them to specifically link each condition to the chemical(s) believed to have caused it and to specifically refer to the scientific or other literature forming the basis of their opinion as to *each* plaintiff. [FN17]

Second, both doctors purportedly rely on literature provided by plaintiffs' counsel as the bases of their opinions. The Court fails to see how the doctors can rely on the literature cited when Dr. Hines admittedly did not read all the literature and Dr. Nelson found much of the literature useless. For instance, Dr. Hines cites forty-five articles and treatises in his affidavit but admitted in his deposition that he only read some of the literature cited in connection with this case. *See* List of Articles Read, Ex. 25 to Def.Supp.Br.; Comparison of Items Cited & Items Read, Ex. 26 to Def.Supp.Br. During his deposition, Dr. Hines testified that throughout his career he has done general reading, but that his Deposition Exhibit 6 lists the only literature he reviewed "in reference to this litigation specifically." Hines Dep. at 352, Ex. 39, Def.Sup.Br. Deposition Exhibit 6 contains only twenty-five of the forty-five articles cited in his affidavit. Thus, Dr. Hines apparently failed to read twenty of the articles he cites in his affidavit as bases for his opinion.

Dr. Nelson, by his own admission, found much of the literature useless. He admitted in his deposition that only nine of the forty-one works were "useful clinical information" and "good articles that I would accept as reference for myself." Nelson Dep. at 289; *See* List of Good Articles, Ex. 27 to Def.Supp.Br.; Graphic Comparison of Articles Cited and Articles Accepted, Ex. 28 to Def.Supp.Br. Thus, thirty-two of the forty-one works cited in his affidavit appear to be unacceptable references and yet he still purports to rely on them. *See* Ex. 27 & 28 to Def.Supp.Br. [FN18]

Third, some of the literature cited by the doctors in their affidavits discusses chemicals to which the plaintiffs have not attributed their alleged ailments. For example, two articles discuss benzene, a chemical to which no plaintiff has attributed his alleged injury, illness or condition. *See* Aksoy, *Benzene as a Leukemogenic and Carcinogenic Agent,* Am. J.I. Med., 8:9 (1985) and Aksoy, *Different Types of Malignancies Due to Occupational Exposure to Benzene, A Review of Recent Observations in Turkey,* Environmental Research, Vol. 23, p. 181 (1980), Ex. 40 to Def.Supp.Br. *See also,* Ex. 29 to Def.Supp.Br. Moreover, some of the articles cited by the doctors discuss injuries, conditions or illnesses which neither Dr. Hines nor Dr. Nelson diagnosed in the plaintiffs. For instance, some of the literature cited discusses cancer or Hodgkin's disease. *See* Axelson, *Chlorinated Hydrocarbons and Cancer: Epidemiologic Aspects,* Hemisphere Publ. Co.1980 and Olsson, *Occupational Exposure to Organic Solvents and Hodgkin's Disease in Men,* Scand. J. Work Environ. Health, Vol. 6, p. 302 (1980), Ex. 40 to Def.Supp.Br. *See also,* Ex. 29 to Def.Supp.Br.

*8 In addition to the foregoing, the Court notes that the suspect nature of the affidavits is highlighted by the fact that Dr. Hines' and Dr. Nelson's affidavits are strikingly and implausibly similar and contain many nonsensical sentences. Dr. Nelson's affidavit contains 1727 sentences, not counting the section relating to the doctor's qualifications or the sections which discuss each individual plaintiff's exposure and ailments. Of the 1727 total sentences in Dr. Nelson's affidavit, 1580 are identical to Dr. Hines' affidavit. *See* Hines Aff., Nelson Aff., and Graphic Comparison, Ex. 2 to Def.Supp.Br. The similarity of the affidavits causes the Court to question the doctors' participation in drafting the affidavits and the amount of care they took in formulating their opinions.

Furthermore, the affidavits contain many sentences that make little or no sense. [FN19] For example, both doctors' affidavits contain the following sentence: "Table 1 lists the relative toxicity of certain compounds estimated by narcosis and range to increasing toxicity:" Hines Aff. at 71; Nelson Aff. at 70. Numerous nonsensical sentences like the one just quoted make the Court wonder whether the doctors even bothered to carefully read the affidavits before signing them. [FN20]

II. METHODOLOGY AND FACTS RELIED

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1991 WL 315487 (D.Mont.)
**(Cite as: 1991 WL 315487 (D.Mont.))**

Page 7

UPON BY EXPERTS

In addition to the inadequacy of the doctors' affidavits, the doctors failed to use accepted and rational methodologies in reaching their conclusions. *See Head,* 881 F.2d at 943 (an expert must have arrived at his opinion by employing a methodology that other experts in his field would have relied upon in forming their own opinions about what caused the patient's disease, even though his opinion need not be generally accepted in the scientific community) (quoting *Osburn v. Anchor Lab.,* 825 F.2d 908, 915 (5th Cir.1987). Dr. Hines and Dr. Nelson also did not rely on facts and data reasonably relied upon by other experts in the field. *See* Rule 703, Fed.R.Evid. Specifically, they diagnosed before they researched, they did not even consider alternative causes, and they ignored objective air contaminant measurements from the Livingston work site. The Court will discuss each of these in turn.

First, the doctors' initial set of affidavits diagnosing injuries due to organic solvents were submitted on May 21, 1990. Dr. Hines, who has no particular expertise in the field of chronic chemical exposure, testified that he did most of his work on this case in the month preceding his deposition, which was taken in November of 1990. *See* Court Order date March 6, 1991; Hines Dep. at 326-27, Ex. 39 to Def.Supp.Br. This was five months after his diagnoses in the first set of affidavits.

Likewise, Dr. Nelson admits that his review of the scientific literature began in September of 1990, almost four months after he first diagnosed plaintiffs' injuries and attributed them to chemical exposure. *See* Nelson Dep. at 591- 592, Ex. 39 to Def.Supp.Br. He admitted this despite the fact that he has only seen a few patients for chronic exposure to chemicals (none involving organic solvents), and he agreed that his review of scientific literature was "essential to [his] evaluation of these Plaintiffs, in [his] consideration of their conditions and what might have caused them...." *See* Nelson Dep. at 16 & 727, Ex. 39 to Def.Supp.Br.

*9 It is clear from the doctors' own testimony that they formed their opinions before reviewing the literature and without any particular expertise in the field. As the Court in *Viterbo v. Dow Chemical Co.* stated, "a scientist who forms an opinion before beginning his research lacks the objectivity needed to produce reliable scientific results." *Viterbo v. Dow Chem. Co.,* 646 F.Supp. 1420, 1425 (E.D.Tex.1986), *aff'd,* 826 F.2d 420 (5th Cir.1987) (citing *Perry v. United States,* 755 F.2d 888 (11th Cir.1985)).

Plaintiffs do not object to the defendant's allegation that the doctors diagnosed before researching. Instead, plaintiffs cite *Wilderspin v. Bewley Mills, Inc.,* 298 S.W.2d 636, 639 (1956) for the proposition that a doctor's lack of familiarity with a specific chemical on the patient's initial visit does not preclude the doctor from learning about the chemical and then testifying on cause and effect. Clearly, *Wilderspin* is distinguishable from the case at hand because Dr. Hines and Dr. Nelson testified as to cause and effect in their first affidavits *and thereafter* learned about the particular chemicals involved. As recognized by the Court in *Viterbo,* this is hardly an approach that leads to reliable and objective scientific conclusions.

Second, Dr. Nelson never even discusses the possibility of alternative causes for the plaintiffs' conditions. While Dr. Hines briefly mentions various traumatic events and illnesses in plaintiff Ellison's past, he summarily dismisses the possibility that they could have produced plaintiff Ellison's present symptoms. [FN21] *See* Hines Aff. at 154. Courts have held inadmissible expert opinions that fail to exclude alternative causes. *See, Viterbo,* 826 F.2d at 423 (expert was unaware of a patient's *family* history of conditions related to the alleged toxic injury.); *Agent Orange,* 611 F.Supp. at 1250 (failure to exclude alternative causes.) In the instant case, both doctors failed to adequately *consider* alternative causes even though the plaintiffs' employment, school, and medical records were available to them. [FN22]

The parties in this case collected all available employment, school, and medical records. *See* List of Records, Ex. 13 to Def.Supp.Br. Yet, neither Dr. Hines' nor Dr. Nelson's affidavits mention these outside records and their files on the plaintiffs do not contain any of these outside records. *See* Doctors' Complete Files on Test Plaintiffs, Ex. 7-12 to Def.Supp.Br. This is quite surprising, since both doctors agreed that consideration of a patient's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
1991 WL 315487 (D.Mont.)  
**(Cite as: 1991 WL 315487 (D.Mont.))**

Page 8

medical records is important to a proper diagnosis.

Dr. Hines testified that he obtains past medical records for patients whenever possible because patients may fail to disclose other illnesses that might affect their nervous systems. *See* Hines Dep. at 109-110, 167, Ex. 39 to Def.Supp.Br. Yet, Dr. Hines' file on plaintiff Ellison contains no outside medical records. *See* Ex. 12 to Def.Supp.Br. Moreover, had Dr. Hines consulted outside medical records on plaintiff Ellison, he would have found evidence of other factors which could account for plaintiff's conditions. [FN23]

**\*10** Dr. Nelson likewise agreed that a review of a patient's medical records is one of the factors that he would have to consider in determining whether a patient's condition is due to toxic exposure. Nelson's Dep. at 200-201, Ex. 39 to Def.Supp.Br.Dr. Yet, his files on his five test plaintiffs contain no outside records. Ex. 7-11, Def.Supp.Br. Had Dr. Nelson reviewed the plaintiffs' outside records, he too would have found that other factors could be responsible for some of plaintiffs' conditions. [FN24]

The Court fails to see how plaintiffs can purport to provide the Court with reliable expert opinions on causation when their experts failed to give due consideration to alternative causes. How can the doctors conclude that the plaintiffs' alleged conditions, illnesses and injuries are due to chemical exposure when they have failed to adequately consider the possibility of alternative causes? The doctors must do more than support their opinions with the fact that plaintiffs worked around various chemicals and now suffer from a variety of injuries, illnesses and conditions. *See Johnston v. United States,* 597 F.Supp. 374, 415 (D.Kan.1984) (expert's conclusions were "not supported by any fact other than that the instruments are coated with a radioactive paint and each plaintiff has cancer.")

Third, Dr. Hines and Dr. Nelson ignored or never saw the air contaminant measurements performed at the Livingston shops, which contain results from samples taken and examined for possible contaminants. *See* Ex. 6, to Def.Supp.Br. [FN25] This is the only direct and objective measurement of exposure available and yet, it was not even considered. The doctors' failure to consider the exposure data available to them contradicts Dr. Hines' own testimony concerning how scientists determine the dosage of chemicals to which a person has been exposed:

I think that in practice what people do is they go out and they determine under the circumstances in which the exposure occurred what was the amount, if that's determinable, and sometimes it is, and the duration. And then they can do experimental design to look at inhalation or absorption or whatever method of entry occurs and figure out the dose.

*See* Hines Dep. at 249, Ex. 39 to Def.Supp.Br.; *See also, Christophersen,* 939 F.2d at 1114-15 (expert testimony excluded where expert relied on "critically incomplete or grossly inaccurate dosage or duration data."); *Thompson v. Southern Pac. Transp. Co.,* 809 F.2d 1167, 1169 (5th Cir.1987) (expert opinion that dioxin caused plaintiff's illness had insufficient factual basis since expert had no knowledge of dosage or duration of exposure); *Johnston,* 597 F.Supp. at 414 (court rejected expert opinion because of "propensity to ignore a large amount of well established data which negates their arguments....").

Although Dr. Hines testified that in practice scientists determine dosage if possible, both Dr. Hines and Dr. Nelson ignored or never saw the air contaminant measures from the Livingston shops. Therefore, according to Dr. Hines' own testimony, both doctors did not rely on facts or data reasonably relied upon by experts in the field in forming their opinions, namely objective measurements of the level of exposure. [FN26]

*CONCLUSION*

**\*11** Expert testimony on causation is essential to the case at hand. The only expert testimony submitted by the plaintiffs on the issue of causation is that of Dr. Hines and Dr. Nelson. Based on the foregoing discussion, the Court, in its discretion, concludes that the opinions of Dr. Hines and Dr. Nelson are inadmissible because their opinions simply lack the foundation and reliability necessary to support expert testimony. Without the expert testimony of Dr. Hines and Dr. Nelson, plaintiffs cannot survive defendant's Motion for Summary

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
1991 WL 315487 (D.Mont.)  
**(Cite as: 1991 WL 315487 (D.Mont.))**

Page 9

Judgment because they cannot establish causation. Summary Judgment is therefore mandated because plaintiffs have had adequate time for discovery and have failed to make a showing sufficient to establish the existence of an element essential to their cases. [FN27] *See Celotex,* 477 U.S. at 322. Accordingly,

IT IS ORDERED that defendant's Motion for Summary Judgment as to the six test plaintiffs is granted.

IT IS FURTHER ORDERED that proceedings in the non-test cases are stayed pending final resolution of the six test cases, including resolution of any appeal to the Ninth Circuit from this Order and any subsequent proceedings.

The Clerk is directed to enter judgment in the six test cases.

The Clerk is directed to forthwith notify counsel for the repsective parties of the making of this order.

Done and Dated this 18th day of December, 1991.

FN1. There are now a total of thirty-six plaintiffs.

FN2. The Court notes that both parties agreed to the issuance of a Case Management Order by the Court.

FN3. Rule 104(a) provides:  
Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissability of evidence shall be determined by the court, subject to the provisions of subdivision (b). In making its determination it is not bound by the rules of evidence except those with respect to privileges.

FN4. Rule 702 provides:  
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

FN5. Rule 703 provides:  
The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

FN6. Rule 403 provides:  
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

FN7. Petition for Certiorari filed on November 12, 1991.

FN8. *Lynch v. Merrell-National Lab., Div. of Richardson-Merrell, Inc.,* 830 F.2d 1190, 1196 (1st Cir.1987) (expert failed to provide sufficient foundation for his opinion as to causation); *In re "Agent Orange" Prod.Liab.Litig.,* 611 F.Supp. 1267, 1283 (E.D.N.Y.1985), *aff'd,* 818 F.2d 187 (2nd Cir.1987) ("The unfounded assumptions and speculation underlying Dr. Carnow's testimony reduce its probative value to a point approaching zero."); *Marder v. G.D. Searle & Co.,* 630 F.Supp. 1087, 1093 (D.Md.1986), *aff'd,* 814 F.2d 655 (4th Cir.1987) ("The opinion of an expert must be based on facts sufficient to form a foundation."); *Viterbo v. Dow Chem. Co.,* 826 F.2d 420, 424 (5th Cir.1987) ("Without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible."); *Sterling v. Velsicol Chem. Corp.,* 855 F.2d 1188, 1208 (6th Cir.1988) (expert failed to provide a widely accepted medical basis to justify his opinion on causation); *Mid-State Fertilizer Co. v. Exchange Nat'l Bank,* 877 F.2d 1333, 1339 (7th Cir.1989) (expert did not set forth any specific facts or a reasoned

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
1991 WL 315487 (D.Mont.)  
**(Cite as: 1991 WL 315487 (D.Mont.))**

Page 10

analysis.); *Head v. Lithonia Corp.*, 881 F.2d 941, 944 (10th Cir.1989) (a court must determine whether the foundation of the expert's testimony is sufficiently reliable); *Hull v. Merck & Co.*, 758 F.2d 1474, 1477-78 (11th Cir.1985) (expert's assumptions rendered his opinion speculative); *Merit Motors Inc., v. Chrysler Corp.*, 569 F.2d 666 (D.C.Cir.1977) (there must be some basis for expert's opinion beyond mere theory and speculation.).

FN9. During the hearing on defendant's Motion for Summary Judgment, there was some dispute between the parties as to Dr. Nelson's deposition testimony concerning PET scans. Due to this dispute, the Court granted defendant leave to file the portion of Dr. Nelson's deposition that supported defendant's contentions. Subsequent to the hearing, defendant did file portions of Dr. Nelson's testimony relating to PET scans. Thereafter, the parties filed various motions and briefs regarding how to interpret Dr. Nelson's testimony on the necessity of a PET scan and what the results of a PET scan indicate. Since Dr. Nelson's testimony relating to PET scans is not germane to the Court's ruling on defendant's Motion for Summary Judgment, the Court did not consider these recent filings.

FN10. Plaintiffs contend that defendant is seeking the wrong remedy by moving for summary judgment. In plaintiff's view, defendant should have further deposed Dr. Hines and Dr. Nelson if defendant found the doctors' second affidavits to be inadequate. In support if this contention, plaintiffs refer to the Court's Order dated March 6, 1991, which provided that if the updated affidavits were still inadequate, defendant could file a motion to enforce the Case Management Order and with permission of the Court, depose Dr. Hines and Dr. Nelson as to the six test plaintiffs. The Court finds plaintiffs contention unpersuasive. First, the Order dated March 6, 1991 did not state that defendant's sole remedy for the physicians' inadequate affidavits would be to depose Dr. Hines and Dr. Nelson. The Court merely stated that defendant would be permitted to depose plaintiffs' experts if the physicians' affidavits were again inadequate. Second, defendant's Summary Judgment Motion is not premature. This case has been ongoing for almost two and one-half years and the Court has, on two occasions, given plaintiffs an opportunity to establish causation, which is an essential element of plaintiffs' cases. *See* Order dated February 26, 1991; Order dated March 6, 1991. Furthermore, it is clearly not defendant's obligation to establish causation for the plaintiffs.

FN11. The first set of affidavits were submitted by the plaintiffs pursuant to the Court's Case Management Order issued on February 26, 1990. This Order required plaintiffs to file two documents: (1) a statement describing the circumstances of his alleged exposure to chemicals; and (2) a physician's affidavit on the issues of injury and causation. Plaintiffs were expressly ordered by the Court to specify the chemical(s) believed to have caused the condition, illness or injury alleged by each plaintiff. Moreover, the Court ordered that the physician's affidavit set forth the scientific and medical bases for the physician's opinions on causation as to each plaintiff.

FN12. The Court recognizes that under Rule 705, Fed.R.Evid., an expert may present a naked opinion *unless* "the court requires otherwise." In the case at hand, the Court specifically "required otherwise" and, therefore, cursory conclusions as to injury and causation are not acceptable. *See* Order dated February 26, 1990; Order dated March 6, 1991.

FN13. The Court notes that the doctors' affidavits fail to indicate whether the basis for their diagnoses of the plaintiff's alleged injury, condition, or illness was the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1991 WL 315487 (D.Mont.)
**(Cite as: 1991 WL 315487 (D.Mont.))**

Page 11

plaintiff's history, the doctor's examination of the plaintiff, or a specific test.

Moreover, for some diagnoses, the doctors have absolutely no basis for the injury, illness or condition they diagnose. For example, Dr. Hines diagnoses hearing loss in plaintiff Ellison and Dr. Nelson Diagnoses hearing loss in plaintiff Young, yet, neither doctor's files on these plaintiffs contains the results of an audiogram. *See* Doctor's Complete Files on Plaintiffs, Ex. 11 & 12 to Defendant's Brief in Support of Motion for Summary Judgment ("Def.Supp.Br.") Moreover, Dr. Nelson diagnoses shortness of breath in plaintiff Young and yet, there are no chest x-rays, pulmonary function test, or other formal lung tests in Dr. Nelson's file on plaintiff Young. *See* Ex. 11 to Def.Supp.Br.

FN14. The Court will refer to the nine sections following the description of the doctors' background as the "General Toxicology Section."

FN15. Ordinarily the Court would refer to original documents. However, because defendant has compiled information relating to the doctors' affidavits in such a useful and helpful way, the Court will, in many instances, simply refer to defendant's briefs and exhibits in lieu of the doctors' affidavits. Moreover, the Court notes that plaintiffs have presented no substantive challenge to those portions of defendant's briefs and exhibits to which the Court refers. Therefore, the Court sees no reason to "reinvent the wheel."

FN16. Plaintiffs contend that all the chemicals present at the Livingston shop were mentioned in the affidavits, even if none of the plaintiffs were exposed to such chemicals, because they are relevant to the issue of liability. Plaintiffs fail to recognize that the affidavits were to address only the issues of *injury and causation,* not liability. Furthermore, defendant's Motion for Summary Judgment concerns the issue of causation, not liability.

FN17. Apparently, plaintiffs' response to the lack of medical and scientific support for the majority of the conditions diagnosed in the plaintiffs is that no support is necessary because the chemicals are toxic and defendant's business records demonstrate the toxicity of the chemicals at issue. Plaintiffs seem to think that by merely showing that a given chemical is toxic they have established causation.

This view is far too simplistic since the issue in this case is whether a particular chemical can cause a specific condition, illness or injury at the dose to which a plaintiff was exposed in the way in which a plaintiff was exposed.

Even Dr. Nelson admitted in his deposition that a simple statement in a book or a material safety data sheet stating that a chemical has the capacity to cause a certain injury is not sufficient to establish that the chemical could have caused a specific plaintiff's injury. Dr. Nelson agreed that one must look at whether a particular chemical can cause the kind of injury, that these plaintiffs allege, in people who are exposed in the same way these plaintiffs were exposed. Nelson Dep. at 732-33, Ex. 39 to Def.Supp.Br.

FN18. Plaintiffs offer the Court no reasonable explanation for Dr. Hines' admitted failure to read all the literature cited and Dr. Nelson's testimony that he found much of the literature unacceptable.

FN19. *See* Hines Aff. at 24 lines 46-48, 37 lines 22-25, 73 lines 22- 23, 78 lines 15-20, 96 line 22-23, 114 lines 10-14, 122 lines 1-3, 134 lines 9-14, 156 lines 12-17; Nelson Aff. at 25 lines 39-41, 38 lines 21-24, 72 lines 21-22, 77 lines 10-15, 94 lines 18-19, 111 lines 14-18, 119 lines 1-3, 132 lines 6-11, 179 lines 11-17.

FN20. Plaintiffs offer the Court no explanation for the similarity of the affidavits or for the many nonsensical sentences.

FN21. Dr. Hines simply mentions the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1991 WL 315487 (D.Mont.)
**(Cite as: 1991 WL 315487 (D.Mont.))**

Page 12

traumatic events and illnesses and then states that they could not have caused plaintiff Ellison's present condition because "[h]is history has shown the onset of these symptoms profoundly different from conditions associated with these traumatic events years ago." Hines Aff. at 154. He does not provide any reasoned analysis or insight as to when the symptoms began or what kind of an impact the traumatic events had on plaintiff Ellison.

FN22. The Court recognizes that the admissibility of Dr. Hines' and Dr. Nelson's opinions does not depend upon their ruling out every possible alternative cause. The Court is mindful of the fact that in FELA cases "[i]t does not matter that, from the evidence, the jury may also with reason, on the grounds of probability, attribute the result to other causes ..." *Rogers,* 352 U.S. at 506 (footnote omitted). However, before the Court can even apply the FELA standards for determining whether there is sufficient proof of causation, the Court must first determine whether the sources of Dr. Hines' and Dr. Nelson's opinions are sufficiently reliable to warrant reception of the opinions. The doctors' failure to even consider alternative causes goes to the reliability of the bases of the doctors' opinions and therefore the admissability of their opinions.

FN23. Dr. Hines testified that "it would be very important" to find out whether a patient had thyroid disease because "[t]here are a number of neurologic syndromes that can potentially be associated with both low thyroid and high thyroid abnormalities." Hines Dep. at 125, Ex. 39 to Def.Supp.Br. Plaintiff Ellison denied ever having thyroid disease on his patient questionnaire but his medical records indicate that he has had hypothyroidism since 1963. *See* Ex. 14 to Def.Supp.Br. Furthermore, Dr. Hines diagnoses plaintiff Ellison as having "[h]earing loss from exposure to noise and chemicals." Hines Aff. at 153. However, plaintiff Ellison's medical records indicate that he has had a condition called "cholesteatoma" due to repeated ear infections. This condition destroyed two of the bones in the middle ear before being removed. Ex. 15 to Def.Supp.Br.

FN24. For instance, Dr. Nelson diagnosed plaintiff Eggar's intellectual deficits including "dyscalculia" (poor arithmetic ability) and "spelling dyspraxia" (poor spelling ability) as being attributable to chemical exposure. However, he apparently was not aware that plaintiff Eggar has suffered from intellectual deficits since childhood. Defendant pointed out plaintiff Eggar's life-long intellectual problems a year ago in its Brief in Support of Motion to Enforce the Case Management Order, yet, Dr. Nelson continues to attribute these intellectual deficits to chemical exposure without considering other causes. *See* Nelson Aff. at 162.
Plaintiff Young is disabled due to a back injury which is not related to this case.
Nelson Dep. at 331-32. Dr. Nelson testified that plaintiff Young's complaints of shortness of breath, loss of energy, declining memory, and headaches could have developed because of the back injury. *Id.* at 621-22. Yet, in his affidavit, Dr. Nelson attributes these problems to chemical exposure and does not address the issue of plaintiff Young's disabling back injury.

FN25. Defendant produced almost 100 pages of documents which provide the results obtained from performing an analysis of the samples taken at the Livingston shop. Included in the analysis for possible contaminants are many of the chemicals which plaintiffs claim caused their injuries, illnesses, or conditions.

FN26. Plaintiffs do not contend that the doctors did consider the air contaminant measurements, but rather contend that the documents produced by the defendants

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
1991 WL 315487 (D.Mont.)  
**(Cite as: 1991 WL 315487 (D.Mont.))**

Page 13

were not verified or explained by an expert. Plaintiffs apparently miss the point. The fact that neither doctor even considered the objective air contaminant measurements goes to the reliability of the bases of the doctors' opinions. After all, the doctors had information readily available to them regarding the level of exposure or dose and failed to even look at it, despite the fact that Dr. Nelson testified that in practice scientists determine the dose of exposure if possible. Moreover, defendant submitted the affidavit of Theresa Schneider to authenticate the air contaminant measurements. *See* Ex. 1 to Defendant's Reply Brief in Support of Motion for Summary Judgment.

FN27. Plaintiffs essentially contend that it would be improper for the Court to grant defendant's Motion for Summary Judgment because plaintiffs are still conducting discovery. Plaintiffs apparently fail to realize that they have had almost two and one-half years to conduct discovery and have had two Orders from the Court apprising them of the fact that they had to have supportable expert testimony on the issue of causation. See Order dated February 26, 1990; Order dated March 6, 1991. Moreover, plaintiff's "mere hope that further evidence may develop prior to trial is an insufficient basis upon which to justify denial of [a summary judgment] motion." *Neely v. St. Paul Fire and Marine Ins. Co.,* 584 F.2d 341, 344 (9th Cir.1978).

1991 WL 315487 (D.Mont.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.