# EXHIBIT C

Page 266

1    A. I probably read the first one that I saw,
2    but any subsequent letters, if they looked like the
3    same letters I received regarding other patients, I
4    did not read other than to just quickly scan them and
5    identify it as being similar to the previous letters.
6        Q. The letter states in the first paragraph,
7    "We have selected your case to be filed with a group
8    of other employees in the United States District Court
9    on September 4, 2002." Were you aware that these
10   individuals, and particularly Mr. Kiniry, had already
11   been selected to be the plaintiff in a lawsuit based
12   on his hearing difficulties even before you provided
13   your opinion as to his, as to the cause of his hearing
14   difficulties?
15           MR. PERRY: Objection to form. You
16   can answer if you know it. Can you read back the
17   question, please?
18           (Whereupon, the question was
19           read back.)
20       A. Well, certainly my recollection from the
21   letter would be that the individuals to whom these
22   letters were addressed were being sent to me because
23   of an assumed connection between their hearing loss
24   and occupational loss exposure. However, my further
25   assumption was that the decision, the final decision

Page 267

1    regarding whether these individuals would be included
2    amongst the others in this case would be contingent
3    upon my medical evaluation and opinion.
4        Q. Were you told that at any time by either
5    Mr. Cahill Mr. Goetsch or Mr. Perry?
6        A. I was not specifically told that, no.
7    They were sent to me to do the evaluation and make
8    appropriate recommendations as well as providing a
9    report, but my understanding would be that if my
10   conclusions were at variance with their conclusion,
11   that they would not proceed with legal action.
12       Q. Aside from your notation in your report on
13   the second paragraph that the plaintiff had been
14   exposed to the noise of passing trains, relays and
15   track equipment, did you discuss his noise exposure in
16   any more specific detail, his occupational exposure?
17       A. No.
18       Q. So I take it you didn't talk about his
19   time-weighted exposure to railroad machinery or
20   equipment?
21       A. That's right.
22       Q. Do you feel that there are any
23   non-occupational things that contributed to the
24   plaintiff's hearing difficulties presently?
25       A. At the age of 57 there could conceivably

Page 268

1    be some contribution to the high frequency loss based
2    on degenerative changes. I would not be able to
3    include that there were any other significant
4    contributing factors.
5        Q. Do you feel that advanced age contributed
6    at all to the plaintiff's present hearing
7    difficulties?
8        A. I feel that his age could have contributed
9    modestly to this high frequency hearing loss.
10       Q. Aside from your evaluation of Mr. Kiniry,
11   your education, training and experience, did you rely
12   on any other or anything else rather in reaching your
13   opinion that the plaintiff is suffering from noise
14   induced sensorineural hearing losses?
15       A. No.
16       Q. Did the plaintiff indicate to you any
17   hobbies or recreational activities that could have
18   contributed to his present hearing difficulties?
19       A. No.
20       Q. What did the plaintiff tell you about the
21   availability of ear protection at his job?
22       A. He indicated that hearing protection
23   equipment was available and that he had been using it
24   on an occasional basis for 10 years.
25       Q. Aside from saying he used it occasionally

Page 269

1    did he get any more specific with you about how
2    frequently he would use it?
3        A. No.
4        Q. Aside from what the plaintiff told you
5    about his occupational noise exposure -- withdrawn.
6    Were you aware that the plaintiff was exposed to M-14
7    fire while he was in the Navy?
8        A. No.
9        Q. Would that exposure have any effect on
10   your present opinion relative to your diagnosis of the
11   plaintiff's hearing difficulties?
12       A. Depending upon the degree of exposure then
13   indeed exposure to gunfire could have also played a
14   contributory role.
15       Q. Putting aside the plaintiff's exposure to
16   occupational noise during his career on the railroad,
17   his audiogram, as you took it in 2002, would those
18   results be consistent with someone who was 57 years
19   old and has been exposed to gunfire in the past?
20       A. Given adequate exposure to gunfire, the
21   combination of age and gunfire exposure could produce
22   a hearing loss pattern like this. The critical
23   element really is how much gunfire was he exposed to
24   and was there any other noise exposure, which could
25   contribute to this. These hearing loss patterns are

Page 313

1  Mr. Kiniry, so I would just object to the
2  singular use of the word "opinion."
3     A. This does represent new information
4  since I was deposed.
5     Q. Okay. And could you -- is this your
6  handwriting that appears on pages 1 and 2 of
7  this exhibit?
8     A. Yes.
9     Q. Could you please read your handwriting
10 into the record just so we have it?
11    A. January 18, 2005. The note is written
12 in the SOAP formality, S-O-A-P, and under S,
13 which refers to subjective, "Hearing loss seems
14 somewhat worse than two years ago. Describes
15 increased hearing loss, temporarily consistent
16 with TTS," means temporary threshold shift, "for
17 possibly several hours after exposure to noise.
18 Still working in signal maintenance. Generally
19 does not use hearing protection devices. Last
20 exposed to noise approximately 15 to 20 minutes
21 ago. No itchiness."
22         Under O, objective findings,
23 "Right ear, moderate amount of nonobstructive
24 cerumen removed. Tympanic membrane clear and
25 mobile. Left ear, moderate to large amount of

Page 314

1  cerumen and desquamated debris removed. Nearly
2  obstructive. Tympanic membrane clear and
3  mobile. Rinne positive bilaterally.
4  Audiogram: See report."
5         Then under the heading A, for
6  assessment, "Question, slightly increased
7  hearing loss bilaterally since August of '02
8  audiogram (versus temporary threshold shift)."
9         Then under that, under P, or
10 plan, "Recommend use of hearing protection
11 devices. Trial of amplification for left ear.
12 Recheck hearing in one to two years."
13    Q. All right.
14    A. She does not have the updated hearing
15 test.
16       MR. PERRY: There was another
17 hearing test?
18       THE WITNESS: Yes.
19       MR. PERRY: I'll make a copy.
20       MS. PARZYMIESO: Can you just
21 mark that 9A.
22       (Defendants' Exhibit 9A marked
23        for identification.)
24 BY MS. PARZYMIESO:
25    Q. Dr. Kirchner, we've just marked as

Page 315

1  Exhibit 9A for identification the audiogram that
2  appears that you performed on Thomas Kiniry
3  during his January 18, '05 visit; is that
4  correct?
5     A. Yes.
6     Q. Okay. In your notes that you just
7  read into the record, from the January 18, 2005
8  visit, you note that Mr. Kiniry was last exposed
9  to noise "15 to 20 minutes ago." Did you find
10 that significant to his diagnosis?
11    A. Yes.
12    Q. And how so?
13    A. Because exposure to loud noise can
14 cause a temporary threshold shift. It can
15 temporarily depress the hearing thresholds
16 beyond the baseline level for periods of several
17 hours after noise exposure.
18    Q. Okay.
19    A. The implication of that is that his
20 hearing as tested on January 18 may have
21 appeared worse than it actually would have had
22 he been tested 18 to 24 hours after his last
23 noise exposure.
24    Q. Okay. Is it then fair to say that an
25 accurate comparison cannot really be made

Page 316

1  between the August -- or, I'm sorry, the January
2  18, 2005 audiogram to the August 27, 2002
3  audiogram?
4     A. Yes.
5     Q. Okay. Did your evaluation of
6  Mr. Kiniry on January 18th, 2005, did that
7  evaluation change your opinion or opinions of
8  Mr. Kiniry's hearing loss in this matter?
9     A. No.
10    Q. Have you or do you intend to update
11 your letter to Cahill & Goetsch discussing your
12 opinion of Mr. Kiniry or opinions of Mr. Kiniry
13 in this matter?
14    A. I have not been asked to do so and was
15 not planning to do so.
16    Q. Okay. And I don't recall from
17 Mr. Kiniry's records, but did you recommend
18 amplification for him back in 2002?
19    A. In 2002, my comment was that he was a
20 borderline candidate for amplification of one or
21 both ears, suggesting that I may have discussed
22 it with him but did not recommend it at the
23 time.
24    Q. And are you recommending a hearing aid
25 for him now?

Page 345

1    A. No.
2    Q. In your file, you have a June 20th,
3  2003 letter to Cahill & Goetsch, to George
4  Cahill. I believe you state in your letter,
5  "It is my opinion to a reasonable degree of
6  medical certainty that occupational noise has
7  contributed to his hearing loss." What did you
8  rely upon in making this opinion?
9    A. My conclusion was based upon the
10 history he provided, the hearing test results,
11 my training, education and experience.
12   Q. And in your letter you also refer to a
13 1966 presentation by Dr. Aram Glorig. Were you
14 present for the presentation that you mention in
15 your letter?
16   A. No.
17   Q. Do you have the literature or text of
18 Dr. Glorig's presentation?
19   A. Yes, I believe I do.
20   Q. What was the subject of his
21 presentation?
22   A. Noise exposure in the railroad
23 industry.
24   Q. How did you obtain a copy of the
25 literature or the text of Dr. Glorig's

Page 346

1  presentation?
2    A. It was provided to me by the firm of
3  Attorney Cahill.
4    Q. And do you recall if you reviewed that
5  presentation prior to your evaluation of
6  Mr. Compo?
7    A. I don't recall if I reviewed it prior
8  to my evaluation of Mr. Compo.
9    Q. Did you bring a copy of Dr. Glorig's
10 presentation or the text of the presentation
11 with you?
12   A. I don't have a copy of that today,
13 no.
14        MS. PARZYMIESO: Off the record.
15        (Discussion off the record.)
16        MS. PARZYMIESO: Back on the
17 record.
18 BY MS. PARZYMIESO:
19   Q. Dr. Kirchner, is it your opinion that
20 if Mr. Compo had never worked for the railroads,
21 he wouldn't have sustained high frequency
22 hearing loss?
23   A. My opinion is that if he had not
24 worked for the railroad, his -- any hearing
25 loss, any high frequency hearing loss, would be

Page 347

1  less severe than it was at the time of the
2  evaluation, of his evaluation.
3    Q. So then would you agree that it's
4  certainly possible that Mr. Compo could have
5  sustained hearing loss based upon heredity,
6  medical history or recreational activities?
7        MR. PERRY: Object to form.
8        You can answer.
9    A. Yes. I believe that he could now have
10 a high frequency loss based also upon other
11 factors in addition to the loss which I believe
12 is attributable to noise exposure while working
13 at the railroad.
14   Q. Is it your opinion that Mr. Compo's
15 hearing loss is permanent?
16   A. Yes.
17        MS. PARZYMIESO: That's all I
18 have on Mr. Compo.
19        MR. PERRY: Quick break, please.
20        (Recess: 11:10 to 11:20 a.m.)
21 BY MS. PARZYMIESO:
22   Q. Dr. Kirchner, I'd like to review with
23 you your records on Edward Russo.
24   A. Yes.
25        MS. PARZYMIESO: Can you mark

Page 348

1  this.
2        (Defendants' Exhibit 11 marked
3        for identification.)
4    Q. Dr. Kirchner, do you recall if Edward
5  Russo was referred to you?
6    A. I believe that he was referred to me
7  by the law firm of Cahill & Goetsch.
8    Q. And what was your understanding of the
9  purpose of the referral?
10   A. The purpose of the referral was to
11 provide a medical evaluation and report.
12   Q. Were you aware that Cahill & Goetsch
13 represented or was representing Mr. Russo in an
14 occupational hearing loss action against the
15 railroad at the time the evaluation was
16 scheduled?
17        MR. PERRY: Objection to form;
18 competency, foundation.
19        You can answer if you know.
20   A. I was aware that he was referred to me
21 by Attorney Cahill and could be included in a
22 claim against the railroad for occupational
23 noise exposure.
24   Q. Do you recall when you found out about
25 the representation?

Page 365

1  work environment, that he maintained pretty much
2  the same position for 27 years at the railroad,
3  how long would you believe it would take for a
4  high frequency hearing loss to evidence itself
5  in an audiogram?
6          MR. PERRY: Object to form.
7          You can answer.
8      A.  In my limited exposure to railroad
9  equipment, and to the noise that they produce, I
10 believe that track laborers are at unusually
11 high risk for developing high frequency noise --
12 high frequency hearing loss from noise
13 exposure.  I believe that a measurable hearing
14 loss could have occurred within a few years
15 after he started working.
16     Q.  Then how long would you say it would
17 take for him to then notice a hearing loss?
18         MR. PERRY: Object to form.
19     Q.  Based on what you know about
20 Mr. Russo's work environment?
21         MS. PARZYMIESO: Objection to
22 form.
23         You can answer.
24     A.  That's much more difficult to say
25 because it very much depends upon the individual

Page 366

1  and upon the demands they place upon their
2  hearing. It's possible that he could go for
3  many years without being aware of a hearing loss
4  because the loss affects frequencies beyond the
5  speech frequencies in the early stages.
6          Additionally, when it becomes
7  evident to someone that they do indeed have a
8  hearing loss, they may be able to look back, or
9  to think back and realize that they've had a
10 problem for some time but that they didn't
11 recognize previously.
12         The subjective hearing loss
13 really depends upon the life-style of the
14 patient and upon their general perceptual
15 abilities.  I think it depends also upon other
16 issues that may be going on in their life,
17 medical and otherwise, and it may also depend
18 upon how much denial they're in about it, about
19 a hearing problem.
20     Q.  I think you had said that based on
21 what you know of railroad equipment, that track
22 laborers have an unusually high risk of high
23 frequency hearing loss; is that correct?
24     A.  Yes.
25     Q.  What are you basing that on?

Page 367

1      A.  I live near the railroad, and the
2  track that goes by our house was all replaced,
3  the whole railroad bed was replaced three or
4  four years ago.  It was done in the middle of
5  the night, and even though I live maybe a
6  hundred fifty or 200 yards, and had both our
7  storm windows and our inner windows closed when
8  this work was going on, it would wake me up
9  every night. The pounding and hammering and
10 diesel engine noise was unbelievably loud.
11     Q.  So your statement then is based on
12 your own personal experience?
13     A.  Yes.
14     Q.  And not based on any literature that
15 you've reviewed or studies that you've done or
16 read about?
17     A.  That's correct.  It's based upon
18 personal experience.
19     Q.  Okay.  Do you feel that anything
20 nonoccupational may have contributed to
21 Mr. Russo's high frequency hearing loss?
22     A.  Yes.
23     Q.  Such as what?
24     A.  I believe that there may have been a
25 contribution not only to the high frequency loss

Page 368

1  but to the lower frequency loss in each ear,
2  particularly the right ear, from familial inner
3  ear disease, and I conclude that based upon the
4  shape of the audiometric patterns and upon the
5  likely family history of hearing loss referred
6  to in my note about his maternal grandmother.
7      Q.  I think you also said that someone
8  with Mr. Russo's experience on the railroad,
9  they may show high frequency hearing loss on an
10 audiogram as soon as a few years after being
11 exposed to the noise.
12         If a person -- if Mr. Russo had
13 audiograms performed throughout his career at
14 the railroads, and they did not show any hearing
15 loss, high frequency hearing loss, until after
16 about 20 years of working on the railroad, would
17 that affect your opinion on whether his hearing
18 loss was occupationally related?
19         MR. PERRY: Objection to form.
20         You can answer.
21     A.  It would make me question the noise
22 exposure from year to year, yes.  If I saw no
23 measurable hearing loss in the higher
24 frequencies 20 years after he started working
25 there, I would wonder how much noise he was

Page 445

1  audiogram from October 1, 2002.
2      Q.  Are you aware if Mr. Caffery ever
3  underwent a hearing aid evaluation?
4      A.  I'm not aware of whether or not he
5  underwent a hearing aid evaluation.
6      Q.  You recommended that Mr. Caffery have
7  a repeat hearing test in one year.  Do you know
8  if he ever obtained another hearing test?
9      A.  No, I don't know.
10     Q.  And you state in your report that the
11 pure tone patterns on Mr. Caffrey's audiogram
12 are consistent with noise trauma.  What is the
13 basis for that opinion?
14     A.  It's based on the combination of the
15 history he provided of noise exposure over many
16 years and the particular pure tone pattern in
17 each ear.  The hearing loss in each ear is
18 predominantly high frequency, and it exhibits
19 the notch-like pattern which peaks in the four
20 to six thousand hertz range and is, therefore,
21 very strongly suggestive of loud noise as the
22 most likely cause of the loss.
23     Q.  Would the results of Mr. Caffrey's
24 2002 audiogram be consistent with any other
25 ailment, problem or cause?

Page 446

1      A.  There are other ailments which
2  potentially could cause a high frequency loss,
3  or contribute to it, but there are no other
4  ailments which would likely produce a pattern
5  like this.
6      Q.  What are the results of Mr. Caffrey's
7  audiogram on October 1st, 2002?
8      A.  What are the results?
9      Q.  Yes.
10     A.  In the right ear, his hearing acuity
11 from 250 to 2,000 hertz is normal.
12         There is then a steeply sloping
13 loss affecting the higher frequencies, with the
14 greatest losses measured at 4,000 and 6,000
15 hertz, and the losses at those two frequencies
16 are 70 DB.
17         In the left ear, the hearing from
18 250 to 1,000 hertz is in the normal range.
19         Above 1,000 hertz, there is a
20 steeply sloping loss, again peaking at 4,000 and
21 6,000 hertz, with decibel losses at those
22 frequencies of 100 decibels.
23         The hearing at 8,000 hertz is
24 slightly more acute with a loss of 90 decibels.
25     Q.  All right.

Page 447

1      A.  The speech reception thresholds are 15
2  and 20 decibels in the right and left ears,
3  respectively, with excellent discrimination
4  scores.
5          Again, this test was performed in
6  a sound booth, so that the results don't
7  replicate the normal listening situations where
8  he's having trouble hearing.
9      Q.  Do you have any knowledge as to
10 whether the results of this audiogram on October
11 1st, 2002, are consistent with any prior
12 audiograms of Mr. Caffery?
13     A.  I don't know how this hearing test
14 compares with previous hearing tests.
15         MS. PARZYMIESO:  Can you mark
16 this letter as 14B.
17         (Defendants' Exhibit 14B marked
18         for identification.)
19     Q.  Dr. Kirchner, I've marked as Exhibit
20 14B a letter bearing your signature dated April
21 6, 2004, to Attorney Cahill at Cahill & Goetsch,
22 regarding your evaluation of James Caffery.  In
23 this letter, you state that "It is my opinion to
24 a reasonable degree of medical certainty that
25 occupational noise has contributed to his

Page 448

1  hearing loss."
2          What did you rely upon in making
3  this opinion?
4      A.  I relied upon his history of
5  occupational noise exposure over a 33-year
6  period, the results of his hearing test on
7  October 1, 2002, my training, education and
8  experience.
9      Q.  Was there anything else that you
10 relied upon in reaching that opinion?
11     A.  No.
12     Q.  You mentioned Dr. Glorig's 1966
13 presentation to medical and surgical officers of
14 the Association of American Railroads.  Did you
15 rely upon that presentation in making your
16 opinion?
17     A.  No.
18     Q.  Is it your opinion that if Mr. Caffery
19 had never worked for the railroads, he wouldn't
20 have sustained high frequency hearing loss?
21     A.  My opinion is that any high frequency
22 hearing loss he may have had at the time of his
23 visit in October 2002 wouldn't have been as
24 severe had he not worked for the railroad.
25     Q.  Would you agree that it's possible

Page 555

1  Mr. Loverme first developed the hearing loss as
2  reflected in his 2002 audiogram performed by
3  your office?
4       MR. PERRY: Object to the form.
5  Are you asking when, is it?
6       MS. PARZYMIESO: Does he have an
7  opinion about when Mr. Loverme may have realized
8  he had a hearing loss or does he have an opinion
9  about when the hearing loss would be evidenced
10 on the audiogram? Does he have an opinion about
11 when the hearing loss would be evidenced on the
12 audiogram?
13     A. I believe that the hearing loss which
14 is demonstrated by the audiogram would have
15 appeared at least in a milder form, well before
16 he became aware of it, probably within a few
17 years after beginning employment with the
18 railroad.
19     Q. Do you have an opinion based on the
20 2002 audiogram as to when Mr. Loverme would have
21 noticed hearing difficulties?
22     MR. PERRY: Object to form.
23     You can answer.
24     A. That is very variable from one
25 individual to the next. It depends to a

Page 556

1  considerable extent upon their life-style, their
2  perception of personal problems, denial of
3  problems, complaints from other people. I can
4  really only go by what he told me. I have no
5  other evidence to indicate to me when he would
6  have or should have become aware of it.
7       Q. And he told you he first started
8  having difficulties about a year before you
9  evaluated him; is that correct?
10      A. He noted that he at least became aware
11 of the problem when he was told at the time of
12 the hearing test about a year before his
13 appointment with me that he did indeed have a
14 hearing loss.
15      Q. Also in your file on Mr. Loverme,
16 there's a letter dated June 20th, 2003, from you
17 to Attorney Cahill, concerning your evaluation
18 of Mr. Loverme.
19          MS. PARZYMIESO: I'm going to
20 mark this.
21          (Defendants' Exhibit 18C marked
22          for identification.)
23      Q. In this letter you state that based on
24 Mr. Loverme's complaints, medical history,
25 history of noise exposure while working for the

Page 557

1  railroad for the past 30 years, his physical
2  examination and audiological test results, it is
3  your opinion to a reasonable degree of medical
4  certainty that occupational noise has
5  contributed to his hearing loss.
6       Does the information contained in
7  that paragraph form the total basis for your
8  opinion as to Mr. Loverme?
9       A. Well, my opinion is based additionally
10 on my education, training, and the experience
11 that come to bear on the evaluation of any
12 individual patient.
13      Q. In determining that occupational noise
14 contributed to Mr. Loverme's hearing loss, had
15 you gone out to the railroad and observed
16 Mr. Loverme perform his duties?
17      A. No.
18      Q. Have you ever seen Mr. Loverme be
19 exposed to any occupational noise?
20      A. No.
21      Q. Have you obtained data or other
22 information quantifying the amount of noise that
23 Mr. Loverme is exposed to working as a welder or
24 a track worker?
25      A. No.

Page 558

1       Q. Have you taken any measurements
2  regarding how close Mr. Loverme works in
3  proximity to machines or equipment that expose
4  him to the noise?
5       A. No.
6       Q. Have you ever performed any noise
7  level testing for the equipment and/or machines
8  that Mr. Loverme claims that he's exposed to?
9       A. No.
10      Q. Aside from OSHA regulations, have you
11 reviewed any other rules or regulations
12 concerning noise level guidelines for railroad
13 persons?
14      A. No.
15      Q. Is it your opinion that if Mr. Loverme
16 had never worked for the railroads, he wouldn't
17 have sustained high frequency hearing loss?
18      A. It's my opinion that if he had not
19 worked for the railroad, he either wouldn't have
20 a high frequency sensorineural loss or it would
21 have been less severe than it was at the time of
22 his evaluation.
23      Q. I believe you stated earlier that in
24 order to determine if hearing loss is
25 noise-related that you need to understand the

Page 559

1 intensity and duration of the noise; is that
2 correct?
3        MR. PERRY: Object to form. I
4 think you're talking about specific
5 documentation in the audiogram as to when it
6 would actually start showing up in an audiogram.
7        MS. PARZYMIESO: I was thinking
8 of something different.
9    Q. You had spoken earlier about the
10 intensity and the duration of noise.
11   A. Yes.
12   Q. In forming an opinion that a hearing
13 loss is occupationally-related, do you need to
14 have an understanding of the intensity and
15 duration of the noise that a person is exposed
16 to?
17       MR. PERRY: Object to the form.
18   A. At least in a general sense, yes. If
19 he had told me, for example, that he worked in
20 an office for his 30 years of employment, I
21 would not attribute the hearing loss which we
22 assessed at the time of his visit to
23 occupational noise exposure.
24       The history he provided, however,
25 indicated that he has working near noisy

Page 560

1 equipment, specifically diesel motors, trains
2 and whistles, and based upon general
3 descriptions provided by the patient and also by
4 other employees, railroad employees that I've
5 seen, my conclusion was that he had been exposed
6 to sufficiently high levels of noise over
7 sufficient periods of time to account for what
8 appeared to be clearly noise-induced hearing
9 losses on his audiogram.
10   Q. In performing your evaluation and
11 coming up with your conclusion, had you reviewed
12 any literature discussing the noise emanating
13 from diesel motors or the trains and whistles
14 that one would be exposed to while working for
15 the railroad?
16   A. I didn't review any literature at the
17 time of coming up with this conclusion. I have,
18 over many years and from various articles, seen
19 data pertaining to the noise, for example,
20 generated by various pieces of power equipment.
21 And I've also had over time personal exposure,
22 simply by walking past construction sites. I've
23 had personal exposure to noise generated most
24 commonly by diesel engines. I have been to
25 railroad stations. I've heard horns.

Page 561

1        I have, by virtue of living in
2 close proximity to a railroad track, heard track
3 work being done adjacent to my home.
4        So my understanding of the noise
5 generated by these kinds of equipment is really
6 based upon a combination of complaints provided
7 by the railroad employees, complaints pertaining
8 to difficulty communicating with other employees
9 in the presence of such noise, for example.
10 It's based upon the fact that in many cases
11 these employees were provided with hearing
12 protection equipment by the railroad indicating
13 that they were aware of excessive noise levels,
14 and it's also based upon, as I indicated,
15 figures that I've come across over a period of
16 years pertaining to noise levels generated by
17 various types of construction equipment, and
18 also my own personal experience, personal
19 exposure to at least some of that equipment.
20   Q. Okay. You may have answered this
21 already, in forming your opinions with respect
22 to these hearing loss cases, did you review that
23 literature, again as far as the data, on how
24 loud this equipment or machines are?
25   A. I reviewed some of the literature on

Page 562

1 occupational noise exposure, noise exposure in
2 general, and as part of that, there are figures
3 that describe the noise generated by various
4 pieces of equipment.
5        I didn't pay a lot of attention
6 to the specific figures because one can go from
7 one citation to another and find variations that
8 are not insignificant between the figures that
9 different articles indicate.
10   Q. And you said you have personal
11 experience as far as exposure to how noisy some
12 of these machines and equipment are. In your
13 personal experience, have you taken any
14 measurements or performed any testing levels --
15 strike -- or performed any noise level testing
16 on this equipment or these machines?
17   A. No.
18   Q. Is it possible that there could be
19 some other cause for Mr. Loverme's high
20 frequency hearing loss?
21       MR. PERRY: Object to form;
22 speculation.
23       You can answer the question.
24   A. I believe that other causes could have
25 played a contributory role, but I believe that