UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

FILED 2005 MAR 14 P 3:04 U.S. DISTRICT COURT NEW HAVEN, CT

--------------------------------------X

THOMAS KINIRY,

    Plaintiff

VS.

METRO-NORTH RAILROAD COMPANY,

    Defendant

CIVIL ACTION

NO. 3:02CV01680 (JBA)

MARCH 14, 2005

--------------------------------------X

## PLAINTIFF'S MEMORANDUM IN OPPOSITION
## TO METRO-NORTH'S MOTION TO PRECLUDE DR. KIRCHNER'S OPINIONS

### I. Introduction

Has the expert used a reliable methodology in a reliable way? That is the essential question raised by any *Daubert* motion. There is no dispute that the methodology used here--"differential diagnosis" or "differential etiology"--is accepted by both medical science and the courts as reliable. And as will be seen, Metro-North's attempt to attack the way Dr. Cameron Kirchner used that methodology may be helpful cross-examination fodder but falls far short of justifying the preclusion of his opinions concerning the plaintiff Mr. Thomas Kiniry.

### II. Facts

The plaintiff was informed in October of 1999 by a Metro-North medical department employee that he had hearing loss. About one to two years later, he began

to notice difficulties with his hearing.[1] On August 27, 2002, Mr. Kiniry sought medical treatment and an evaluation from Dr. Cameron Kirchner. Dr. Kirchner is both a treating physician and a retained expert for purposes of this case.

Dr. Kirchner met with Mr. Kiniry, obtained a medical history, performed a routine ear nose and throat medical examination and performed an audiometric test of his hearing. After the audiometric test, Dr. Kirchner met with Mr. Kiniry again to discuss the results. Dr. Kirchner prepared a report setting forth his evaluation, examination, and conclusions. (Dr. Kirchner's Reports and audiometric test results are attached hereto as App. B). Mr. Kiniry sought follow-up treatment and evaluation on January 18, 2005 because he was having increased difficulty hearing. As a result, Dr. Kirchner recommended to Mr. Kiniry that he obtain a hearing aid for one of his ears.

### III. Differential Diagnosis

Differential diagnosis, also referred to as differential etiology, "is a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated." *Westberry v. Gilslaved Gummi AB*, 178 F.3d 257, 262 (4th Cir. 1999). A sub-body of *Daubert* law has developed with respect to the reliability of differential diagnosis, and "federal courts, generally speaking, have recognized that a properly conducted differential diagnosis is admissible under *Daubert*." *Clausen v. M/V New Carissa, et al*, 339 F.3d 1049, 1057 (9th Cir. 2003).

This District and the Second Circuit recognize differential diagnosis as a reliable methodology for proving the causation of a medical condition. *Perkins v. Origin Medsystems Inc.*, 299 F. Supp.2d 45, 57-59 (D. Conn. 2004); *Baker v. Metro-North*

---

[1] High frequency hearing loss involves frequencies beyond the speech range and it can be years before people realize they have a problem. App. A, Dr. Kirchner Dep. Tr. pp. 205, 336.

*Railroad Co.*, 2003 U.S. Dist. LEXIS 19146 (D.Conn. 2003); *Zuchowicz v. United States*, 140 F.3d 381, 387 (2nd Cir. 1998); and *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043-44 (2nd Cir. 1995).

Although differential diagnosis has many aspects, two are of particular interest here: the overwhelming body of knowledge and literature connecting exposure to loud noises to sensorineural hearing loss, and the standard for ruling out alternative causes.

a. <u>Overwhelming Knowledge Connecting Exposure To Loud Noises And Hearing Loss</u>

There is overwhelming medical and scientific literature connecting exposure to loud noises to hearing loss.

It is indisputable that exposure to loud noise over time is one of the most common causes of hearing loss. Damage caused by exposure to loud noises is well known, well documented, and a widely accepted cause of high frequency hearing loss. *See* App. C, Plaintiff's Expert Report from Dr. Peter Rabinowitz.

Even if there were not overwhelming acceptance in the medical community that exposure to loud noise causes hearing loss, the Second Circuit has affirmed the admission of medical expert testimony despite the fact the expert "could not point to a single piece of medical literature" specifically supporting his opinion. *McCullock, supra,* at 1043.

According to Metro-North's own expert, Dr. Joseph Sataloff:

> Hearing loss due to occupational noise exposure is our most prevalent industrial malady and has been recognized since the Industrial Revolution. There are millions of employee with occupational hearing loss in American industry. Our neglect of hearing loss, especially occupational hearing loss, has resulted in human and economic consequences that affect virtually every American household. This is especially regrettable since

3

> noise-induced hearing loss is almost always preventable at relative little costs.

Dr. J. Sataloff, Hearing Loss, (3rd Edition 1993) p. 371.

Dr. Kirchner testified that "[n]oise induced hearing loss is a major category of sensorineural hearing loss. It is probably one of the two major causes of hearing loss in this country." App. A, Kirchner Dep. Tr. p. 91. The other major cause of sensorineural hearing loss is age related hearing loss. *Id.* at 92. Sensorineural hearing loss is "commonly known as 'nerve deafness' or 'inner ear hearing loss.' It refers to hearing loss caused by dysfunction of the inner ear and cochlear nerve structures. As opposed to the middle ear ossicles, tympanic membrane or ear canal." *Id.* at 95. Noise induced hearing loss is primarily sensorineural. *Id.*

The *Hardyman* case cited by Metro-North concerned a detailed analysis of whether to permit a medical opinion that Mr. Hardyman's job caused his carpal tunnel sydrome. Whether work can cause carpal tunnel syndrome is a hotly contested issue. Here, by contrast, no doctor (not even the defendant's own expert) will dispute that exposure to loud noise over time can cause sensorineural hearing loss.

Metro-North's memorandum contains a laundry list of criticisms of Dr. Kirchner. The list is a standard cross-examination outline and does not provide a basis to preclude expert testimony. Simply put, it is not the kind of criticism that warrants preclusion of a proper differential diagnosis.

### b. Standard for ruling out alternative causes

A medical expert is not required to rule out every possible alternative cause of a plaintiff's condition. *Heller v. Shaw Industries, Inc.,*167 F.3d 146, 156 (3rd Cir. 1999)

("A medical expert's causation conclusion should not be excluded because he or she has failed to rule out every possible alternative cause of a plaintiff's illness.").

> Although an expert is not required to eliminate every potential cause in order for his or her opinion to be admissible under *Daubert*, the expert is required to employ either standard diagnostic techniques to eliminate obvious alternative causes or, if the defendant suggests some likely alternative cause of the plaintiff's condition, the expert is required to offer a reasonable explanation why he or she still believes that the defendant's action or product was a substantial factor in bringing about the plaintiff's condition.

*Perkins, supra,* at 61 [citing numerous cases]. As set forth below, Dr. Kirchner eliminates all plausible alternative causes of Mr. Kiniry's hearing loss.

## IV. Dr. Kirchner's Credentials

Dr. Cameron Kirchner is board certified in Otolaryngology. He currently practices in New Haven and has treated patients for over twenty-seven years as an ear nose and throat specialist. He received a B.A. in biology from Middlebury College, a medical degree from McGill University, and served his residency at Massachusetts Eye and Ear Infirmary. He completed his fellowship at Harvard Medical School. See App. D, Dr. Kirchner's *Curriculum Vitae*.

He treats about 80 patients a week, which averages out to thousands of active patients per year. App. A, p. 96. Of the several thousand patients he treats every year, some come in for problems other than hearing difficulties. However, about two percent of the patients he treats annually are diagnosed with occupational hearing loss. App. A, p. 97.

Unlike many doctors, Dr. Kirchner has personally experienced exposure to noise from railroads. He lives about 100 yards from railroad tracks and has heard horns, trains, and railroad track construction noises. App. A, p. 124.

## V. Metro-North's Argument

Metro-North argues Dr. Kirchner must not be allowed to testify because he "failed to do the necessary investigation or analysis to establish Mr. Kiniry's work at Metro-North was a possible cause of his symptoms" and (2) he did not "rule out" all other possible causes high frequency hearing loss. Neither point stands up to an application of the law and facts.

## VI. Dr. Kirchner's Application of Differential Diagnosis

Dr. Kirchner took a history from Mr. Kiniry, performed medical examinations, and obtained audiograms (hearing tests). Dr. Kirchner's consultations with Mr. Kiniry were just like his consultations with other patients who come to him with complaints of hearing loss. App. A, pp. 109 - 122.

Dr. Kirchner described his approach to differential diagnosis as follows: "I consider all the likely factors which can cause hearing loss, and then based upon a combination of the history provided, and the audiometric pattern, and again my education and training and experience, I come up with a conclusion as to the likely cause or causes of any measured hearing loss." App. A, p. 565.

Beyond noise, other causes of sensorineural hearing loss are presbycusis (also referred to as age-related hearing loss or degenerative hearing loss), hereditary hearing loss, Meniere's disease, chronic middle ear infections, and ototoxic drugs.[2] *See, e.g.*

---

[2] Ototoxic drugs are any drugs that can cause hearing loss. App. A, p. 134.

App. A, pp. 145, 146; 426-428 (Dr. Kirchner's testimony regarding another patient, but concerning conditions that can cause hearing loss).

Dr. Kirchner examined Mr. Kiniry on August 27, 2002 and January 18, 2005 at his office. On August 27, 2002 he obtained a detailed medical history and an audiogram.

Dr. Kirchner considered and ruled out hereditary hearing loss. During the first examination, Dr. Kirchner asked Mr. Kiniry if he had a family history of hearing loss in youth to middle age to find out if genetics played a role in the patient's hearing loss. App. A, p. 135. Mr. Kiniry denied any family hearing loss. App. A, p. 260.

Dr. Kirchner considered and ruled out ear infections and ototoxic drug esposure as likely causes of his hearing difficulties. He ruled out ear infections based on Mr. Kiniry's limited history of ear infections (Mr. Kiniry did not recall having any ear infections as a child) and based on his physical examination of his ears, which did not show any signs of chronic infection. App. A, pp. 566-567. He also ruled out ear infections as a cause of Mr. Kiniry's hearing loss because ear infections do not normally cause permanent hearing loss. App. A, p. 262. Dr. Kirchner ruled out ototoxic drugs based on Mr. Kiniry's responses to questions designed to reveal whether Mr. Kiniry was likely to have been exposed to such drugs. See App. A, pp. 132-133, 260.

Dr. Kirchner considered and ruled out Meineire's disease. Meineire's disease generally affects the lower frequencies first and then affects higher frequencies. App. A, p. 145. Also, it will often only affect one ear, or one ear before the second ear is affected. App. A, p. 117. Dr. Kirchner was able to rule out Meineir's disease as a likely cause based, in part, on Mr. Kiniry's audiogram, which showed much greater loss in the

higher frequencies than the lower frequencies and his medical history of perceiving both ears to be equally affected. See App. A p. 260; App B, Report and August 27 Audiogram.

Dr. Kirchner also considered and ruled out presbycusis as a substantial cause of Mr. Kiniry's hearing loss. Presbycusis, also referred to as degenerative hearing loss, begins to evidence itself in an audiogram around the 8000 - 6000 hz range. App. A, pp. 138-139. With degenerative hearing loss, the higher frequencies are typically more severely affected than the lower frequencies, which leads to a sloping audiogram (more hearing loss at a higher frequency). App. A. pp. 140, 179, 238. Most patients Dr. Kirchner has treated with degenerative hearing loss are in their 60s and 70s. App. A, p. 140. Mr. Kiniry's hearing at 8000 hz in both ears was better than it was at 4000 hz. See App. B, August 27, 2002 Audiogram. Thus, Mr. Kiniry did not present a downward sloping audiogram indicative of presbycusis. Also, Mr. Kiniry was only 56 years old when he was examined by Dr. Kirchner in 2002 and was not in the age group, based on Dr. Kirchner's experience, in which presbycusis is most common. Accordingly, Dr. Kirchner concluded presbycusis was not a substantial cause of Mr. Kiniry's hearing loss.

With respect to noise exposure Dr. Kirchner was aware of the following: (1) Mr. Kiniry had been working for the railroad since 1967 in signal maintenance where he had been exposed to the loud noises (as described by the plaintiff) from of trains going by, train horns and track machinery; (2) the fact the railroad considered Mr. Kiniry's work noise exposure loud enough to provide him with ear plugs for his work; (3) Dr. Kirchner's own personal exposure to trains, train horns, and some track construction

8

machinery; and (4) Mr. Kiniry's audiogram results which showed the greatest hearing loss at 4000hz.

After ruling out other likely causes, Dr. Kirchner concluded that given Mr. Kiniry's history of periodic exposure to loud noises on the railroad for over 20 years and his audiogram pattern, it was more likely than not that noise from the railroad was the most significant cause of his hearing loss. Hearing loss most severe between 4000 and 6000 hz is indicative of noise induced hearing loss (App. A, p. 153) and Mr. Kiniry's audiogram revealed the most severe hearing loss at 4000 hz. App. B, August 27 Audiogram.

Again, Dr. Kirchner did acknowledge presbycusis could have contributed to Mr. Kiniry's overall hearing loss. App. A, p. 268. But, it was his opinion that Mr. Kiniry's hearing loss patterns are strongly suggestive of noise exposure as the most significant cause of his hearing loss. App. A, pp. 269-270. Dr. Kirchner combined his training, education, and experience with Mr. Kiniry's medical history, examination and the audiometric test result pattern to conclude that noise on the railroad was the most likely cause and the most dominant cause of Mr. Kiniry's hearing loss. App. A, p. 566.[3]

Metro-North suggests Dr. Kirchner should have extrapolated more details about Mr. Kiniry's exposure to noise while working for Metro-North; however, Metro-North's argument assumes there is a specific amount of noise someone has to be exposed to before they will suffer hearing loss. This assumption is wrong since two individuals

---

[3] If the jury awards Mr. Kiniry damages, they are not permitted to make a reduction for contribution of non-Metro-North noise exposures so long as they find that Metro-North was negligent and that noise exposure from Metro-North contributed, however slightly, to the plaintiff's hearing loss. *Norfolk & Western Railway Co. v. Ayers*, 538 U.S. 135, 144, 158 -159; 123 S. Ct. 1210, 1216, 1224 (2003).

exposed to the same noise for the same time can develop different hearing loss levels due to differences in individual susceptibility. See App. A, p. 181.

Metro-North suggests Dr. Kirchner's opinions are not valid because Mr. Kiniry did not indicate during his medical examination that he was involved in any recreational activities that could cause hearing loss. Metro-North notes that in the course of Mr. Kiniry's deposition he answered questions confirming he set off some firecrackers as a child, and on occasion mowed his lawn and removed snow with a snow blower at his house as an adult. Ironically, Metro-North's medical expert, Dr. Joseph Sataloff, reviewed Mr. Kiniry's deposition, prior audiograms, medical records from other doctors who treated Mr. Kiniry. Yet, he concluded that despite Mr. Kiniry's occasional use of a firecracker as a child and occasional use of a lawn mower[4] and snow blower as an adult, Mr. Kiniry did not have any noise induced hearing loss. Dr. Sataloff concluded that degenerative factors were the only cause of Mr. Kiniry's hearing loss. See App. E, (Dr. Sataloff's Report).

A medical expert's methodology and opinion that exposure to noise from a horn caused a plaintiff's permanent hearing loss was deemed valid where a doctor simply applied the same differential diagnosis technique used by Dr. Kirchner. See Wilson v. Petroleum Wholesale, Inc., 904 F.Supp. 1188, 1190 (D. Col. 1995). Unlike the expert in Wilson, who reached his conclusion based, in part, on less than two minutes of noise exposure to a horn of an unknown decibel level, Dr. Kirchner was aware that for over 20 years the plaintiff was periodically exposed to train horns and track equipment and had knowledge of their respective sound levels based upon personal experience. The only

---

[4] Dr. Kirchner's response when asked about lawnmower noise in connection to another patient was "most lawnmowers don't produce sufficiently loud noise levels over the period of time they are used to cause significant hearing loss." App. A, p. 332.

10

thing the expert in *Wilson* did beyond Dr. Kirchner's methodology was review some of the plaintiff's prior medical records. Doctors, however, need not review all of a plaintiff's medical records in order to reliably perform a differential diagnosis. "The Court agrees with plaintiff's counsel when he says it is not the Court's role to determine whether Dr. Jafek's ultimate opinion is valid. This Court's role is only to determine if Dr. Jafek's underlying methodology is grounded in science to a sufficient degree that it has enough reliability and relevance to satisfy the *Daubert* test." *Wilson*, 904 F. Supp. at 1190. Dr. Kirchner, like Dr. Jafek in *Wilson*, performed an adequate differential diagnosis and the jury should be permitted to hear his opinions.

Dr. Kirchner clearly performed a satisfactory differential diagnosis by considering the causes of sensorineural hearing loss and then ruling out the least probable causes until he was left with the most probable cause.

## V. Conclusion

Metro-North contends there is only one way to perform a differential diagnosis for occupational hearing loss. However, Dr. Kirchner performed the differential diagnosis commonly employed by ear nose and throat doctors to arrive at his opinion that noise from Metro-North was a significant cause of Mr. Kiniry's hearing loss.

In short, Dr. Kirchner used a reliable methodology in a reliable way. Accordingly, for the reasons set forth above, the plaintiff respectfully requests that the Court deny Metro-North's *Daubert* challenge to Dr. Kirchner's testimony, and thus avoid the delay and cost generated by an unnecessary evidentiary hearing. Fed. R. Civ. P. 1.

FOR THE PLAINTIFF,

BY _____
Scott E. Perry
CAHILL, GOETSCH & MAURER, P.C.
43 Trumbull Street
New Haven, Connecticut 06511
(203) 777-1000
CT 017236

### Certificate of Service

This is to certify that a copy of the foregoing was sent first class mail, postage prepaid to:

Charles A. Deluca, Esq.
Ryan Ryan Johnson & Deluca
80 Fourth Street
Stamford, CT 06905

on this _14_ day of March, 2005.

_____
Scott E. Perry

12