**Page 162**

1  Q. Has that been your sole contractor for
2  service and repairs to the extent they needed to
3  be done since you've owned that machine?
4  A. Yes.
5  Q. What is your understanding of how often
6  the audiometer requires calibration?
7  A. Well, I've been having it done for the
8  most part annually. There have -- there's the
9  occasion when we may go two years, but my normal
10 practice is to have them come in once a year and
11 check it.
12 Q. Are you aware of any professional
13 standards, standards particular to audiometers
14 that require calibration on a set schedule?
15 A. No.
16 Q. When you purchased the audiometer back
17 in 1989, were you advised by the entity who you
18 purchased it from how often it was recommended to
19 calibrate the machine?
20 A. No.
21 Q. Why is it important to calibrate the
22 machine periodically?
23 A. To ensure that the test results are
24 accurate.
25 Q. Do you know how the machine is

**Page 163**

1  calibrated?
2  A. I don't know specifically how it's
3  done. I would imagine it's done electronically,
4  compared to a known standard, but how it's done
5  beyond that, I don't know.
6  Q. I believe you testified earlier that
7  you have an independent contractor that operates
8  the audiometer at your office?
9  A. Yes.
10 Q. Do you yourself know how to operate the
11 audiometer?
12 A. No.
13 Q. Let me show you again just as general
14 reference, I believe it was Exhibit 13, which was
15 the materials that you wrote up about Mr. Bourt.
16 I'm sorry, it was Exhibit 12. I'm going to show
17 you the last sheet of that exhibit, which has the
18 name of Ms. Janice Howard, who you identified as
19 one of the individuals who administers audiograms
20 at your office.
21 A. Yes.
22 Q. Is what's contained on that single
23 sheet the extent of the information that is
24 obtained by performing an audiogram upon an
25 individual?

**Page 164**

1  A. It's certainly the extent of the
2  information that we obtained. There is
3  additional testing that is possible to do. But
4  for the purposes of assessing hearing loss, this
5  is typical of what's done.
6  Q. Okay. So when Ms. Howard would perform
7  an audiogram at your request, in this instance
8  upon Mr. Bourt, the audiometer would be used,
9  correct?
10 A. Yes. If it was -- I'm not sure that
11 every single audiogram was done in my office.
12 This audiogram may actually have been done at
13 their office. And the signed -- the signature at
14 the bottom indicates that this was not Janice
15 Howard but a different audiologist. Looks like
16 Marston, who performed this test, so I believe
17 this test may have been done at their office
18 rather than mine.
19 Q. Okay.
20 A. I'm not certain.
21 Q. When the audiogram is performed, using
22 the audiometer, does that produce information or
23 results that are then not transferred to this
24 sheet?
25 A. Not that I know of.

**Page 165**

1  Q. On this document there are two graphs.
2  One titled "left ear," and one titled "right
3  ear." And below the graft, below each graph it
4  says "mask levels." Could you explain to me what
5  that, what those graphs show the results of?
6  A. The graphs indicate the results of
7  tones presented to both the left and right ears
8  at the normal frequencies tested as part of a
9  comprehensive audiogram. The tones are presented
10 in two ways. They're presented through ear
11 phones and then the same tones are presented
12 through a bone conductor to determine whether the
13 loss is sensorineural or whether it's conductive
14 or a combination of both.
15   Additional testing is then done
16 which is not indicated by the information
17 represented on these two graphs but is indicated
18 in the area below the, each graph, indicating the
19 discrimination score for each ear and the speech
20 reception threshold for each ear.
21 Q. Okay. So those would be in the two
22 areas below the graphs, which are titled
23 "speech," on either matrix, I guess?
24 A. Yes.
25 Q. And the top line of those matrixes

Page 166

1  there's "PTA;" is that correct?
2      A.  Yes.
3      Q.  What does that represent?
4      A.  Pure tone average.
5      Q.  And then the middle one, is that
6  speech?
7      A.  Reception at threshold.
8      Q.  Is that the same as speech
9  discrimination?
10     A.  No.  That's the minimum sound level at
11 which speech can be heard.  Not understood, but
12 heard.  The next square here or rectangle is a
13 measurement as to the indication of a
14 discrimination score.
15     Q.  I see.  And that's represented on this
16 particular sheet by 100 with the left ear and 292
17 for the right ear?
18     A.  Yes.
19     Q.  And how about the last ones on those
20 two sections?
21     A.  The last box indicated "SL," is an
22 abbreviation for sensation level.  That is the
23 level above threshold at which words are spoken
24 to the patient and they are expected to repeat
25 them back.  So that is the level above threshold

Page 167

1  at which the discrimination scores are
2  calculated.  So in other words, a person can
3  detect sound at 0 to 5 db, here, that sound level
4  is still so soft that they may not be able to
5  understand speech, so that the spoken word is
6  presented at a much more comfortable listening
7  level, and it's at that level that, from that
8  level that the discrimination scores are
9  calculated.
10     Q.  All right.
11     A.  There's also an indication on this
12 particular test that impedance was performed.  I
13 don't do that in my office.  So this then would
14 have been done at their office, on Church Street.
15     Q.  What is an impedance test?  What does
16 that test for?
17     A.  An impedance test is a test which
18 measures the pressure behind the eardrum.  And
19 usually what is assessed in that particular test
20 is the function of the eustachian tube.
21     Q.  Now results that would be obtained
22 through an impedence test, would that be helpful
23 in reaching a diagnosis of high frequency hearing
24 loss?
25     A.  Usually not.

Page 168

1      Q.  How about the boxed number that appears
2  directly below each side impedence test?
3      A.  These two numbers?
4      Q.  Yes.  70 and 25?
5      A.  Middle ear pressure.  That's an
6  indication of the pressure behind the eardrum.
7      Q.  And again is that number helpful in
8  reaching a diagnosis of high frequency or
9  sensorineural hearing loss?
10     A.  Usually it doesn't apply.  It's much
11 more important for the assessment of hearing
12 losses from middle ear disease, and it's
13 specifically from the eustachian tube problems.
14 So the answer is no, this really has little or no
15 bearing on high frequency sensorineural hearing
16 loss.
17     Q.  Sort of in the middle of that section
18 of the page there appears to be two smaller
19 graphs.  What do those represent?
20     A.  These are pictorial graphs which can be
21 filled in when impedance testing is done.  And
22 the figures here of minus 10 for the left here
23 and 25 for the right here represent what would in
24 pictorial form on these graphs be the peak or the
25 resting pressure behind the eardrum on each side.

Page 169

1  Resting pressure in the left ear would be minus
2  10 and in the right ear it would be 25, and
3  that's in the normal range for both ears.
4      Q.  The audiometer operator who conducts
5  the audiometric testing, would he or she be the
6  individual who plots the points on the two
7  primary graphs on the results sheet?
8      A.  Yes.
9      Q.  And does the audiometer provide a
10 printout of the numbers that are plotted on this
11 graph?
12     A.  No.
13     Q.  Are they to be read off of the machine
14 itself?
15     A.  They're read off the machine.  As the
16 patient responds, if the intensity level is 35 db
17 at 1,000 hertz, for example, the audiologist
18 would then mark the graph at that time.  And then
19 proceed to the next test frequency.
20     Q.  So if I understand correctly, when this
21 test is administered, taking for example, the
22 left ear here, the first X which is plotted at I
23 believe 10 db, at 250 hertz, a tone would be
24 played which would have a frequency of 250 hertz
25 and it would be at a loudness level of 10 db,

Page 170

1  correct?
2      A.  Well, that's -- the mark here indicates
3  the lowest intensity level at which the patient
4  was able to hear that sound.
5      Q.  And by intensity level, that's
6  decibels, correct?
7      A.  Yes.
8      Q.  Okay.
9      A.  So that they would have potentially
10 started at maybe 5 db, and if the patient didn't
11 hear it, there would be no mark here. It
12 wouldn't be until the level that was reached
13 where the patient gave a positive response that
14 there would be a corresponding mark on the graph.
15     Q.  Okay. So as that particular frequency
16 tone was being played, the audiometer operator
17 would be increasing the level of decibels until
18 the patient --
19     A.  Yes. That is a way of doing it. You
20 could also do it the other way. I'm not sure
21 what their practice is in this setting but it can
22 be done both ways.
23     Q.  Now I note on these graphs, both the
24 left ear and the right ear, the X's appear to
25 indicate the air conduction of sound or the ear

Page 171

1  phone study?
2      A.  Yes.
3      Q.  That's a circle for the right ear?
4      A.  Yes.
5      Q.  Below it it gives a legend for bone
6  conduction and it appears to be greater than or
7  less than signs, mathematical symbols.
8      A.  Yes.
9      Q.  Are those symbols indicated on these
10 two graphs?
11     A.  Yes.
12     Q.  And just from looking at this sheet, it
13 appears to mirror, the bone conduction results
14 appear to mirror the air conduction results, is
15 that fair to say?
16     A.  Yes.
17     Q.  Is that most common? Is that how that
18 usually presents itself?
19     A.  Well, that indicates that the loss is
20 sensorineural. If there was a discrepancy
21 between the two, if the air conduction thresholds
22 were below the bone construction thresholds, that
23 would indicate that some or all of the hearing
24 loss was conductive.
25     Q.  Is there a particular pattern that can

Page 172

1  be plotted on a graph such as this that is
2  typically consistent or representative of high
3  frequency sensorineural hearing loss?
4      A.  Yes.
5      Q.  And how would that look?
6      A.  Well, anything at or above the 3,000
7  hertz range where a hearing loss was recorded
8  would be plotted on this graph. And normal
9  hearing is considered to be through a range of
10 about 0 to 20 db, so any mark on these graphs at
11 any test frequency which appears below the 20 db
12 line indicates a hearing loss to some degree.
13 Greater or lesser degree.
14     Q.  So with say a normal audiogram result
15 with half the points plotted at 20 decibels or
16 less, would that be across the entire spectrum of
17 frequencies, 125 to 8000 I guess on this graph?
18     A.  Yes. That would be what you expect to
19 see on a person who has normal hearing.
20     Q.  Does that 20 decibel floor I guess or
21 for lack of a better term, does that go lower or
22 increase in decibels as a person ages? To be
23 more specific, I mean and still be consistent
24 with "normal hearing" in a person of that age?
25     A.  No. The standards don't change in

Page 173

1  accordance with age. If a person comes in and
2  has a loss at 4,000 and 8,000 of 30 decibels,
3  they have by definition a hearing loss, whether
4  they're 5 years old or 50 or 80 years old.
5      Q.  Okay.
6      A.  The fact that older people are more
7  likely to have the high frequency hearing loss is
8  irrelevant.
9      Q.  Because that would not be a normal
10 condition, is that right?
11     A.  Right. It's still considered to be a
12 hearing loss.
13     Q.  I see. What effect can recent noise
14 exposure, I mean in the last -- you know, in 24
15 hours, prior to undergoing an audiogram, what
16 effect can that have on audiogram results?
17     A.  Well, there is a phenomenon called
18 temporary threshold shift, which can cause the
19 reversible -- by definition temporary threshold
20 shift is a reversible hearing loss, which occurs
21 after exposure to loud noise, and largely
22 subsides within 24 hours.
23     Q.  And what would be a typical cause or
24 typical causes of that temporary threshold shift?
25     A.  Well, the major cause is exposure to

Page 174

1 loud noise.
2    Q. Okay. And if someone was exposed to
3 loud noise, sustained a temporary threshold
4 shift, and then came in for an audiogram, would
5 it be fair to say that their results wouldn't be
6 necessarily an accurate reflection of their
7 hearing?
8            MR. PERRY: Objection to form. I
9 don't think you had a timeframe in there.
10    A. Yes. If the temporary threshold shift
11 had not had time to resolve, the answer is yes.
12 The recorded hearing loss would be greater than
13 their true permanent hearing loss.
14    Q. Would that I guess false increase or I
15 don't want to say false positive, but would that
16 increase severity of indicated hearing loss --
17 Withdrawn.
18            Would the person administering the
19 audiogram be able to recognize from looking at
20 the audiogram results that the person was
21 experiencing a sort of higher threshold shift?
22    A. No.
23    Q. Okay. When an individual comes in to
24 see you for a consultation, do you normally
25 discuss with him or her as to when the last

Page 175

1 exposure to noise they had was?
2    A. Yes.
3    Q. And if someone tells you that they've
4 recently been exposed to loud noise within the
5 last 24 hours, do you then advise them not to
6 have an audiogram on that date?
7    A. No. I believe the recommended minimum
8 time lapse is about 14 hours. So for example,
9 there are detailed in my handwritten notes
10 through the charts. I believe in most cases, an
11 indication of the usual work hours during the
12 week. These tests were done -- when they were
13 done in my office were done in the mornings, they
14 would usually come straight to me, not having
15 been to work first. The most recent noise
16 exposure would have been the previous day.
17    Q. Is it able to be defined by audiogram
18 results what exactly is causing a demonstrated
19 hearing loss?
20            MR. PERRY: Just from an audiogram
21 result?
22            MR. SUTTON: Just from an
23 audiogram result.
24    A. No. There are certain audiometric
25 patterns that are seen in relatively few

Page 176

1 conditions. But I'm not aware of any pattern
2 which is pathognomonic of a cause, that is
3 absolutely specific to a cause. I'm not aware of
4 any such pattern.
5    Q. One of the items you discussed when
6 talking about your typical consultation with a
7 plaintiff is you said you perform a typical ENT
8 examination. What does that consist of?
9    A. It consists of an examination of the
10 pinnas, the ear canals, the eardrum. The
11 appearance of the middle ear as it can be
12 evaluated through the eardrum. For the presence,
13 for example, of fluid or inflammation in the
14 middle ear. It also includes a form of tuning
15 fork testing called the Rinne test.
16    Q. What does that test?
17    A. It gives us a rough assessment as to
18 whether a patient has a conductive hearing loss.
19 It's not very precise but in a person who has a
20 significant, usually more than 25 decibel
21 conductive hearing loss, the Rinne test would be
22 abnormal.
23            I then examine their nose for the
24 appearance of the septum and the turbinates, any
25 indication of inflammation, drainage, allergic

Page 177

1 type changes. Examine the mouth, and the
2 pharynx, tonsils, then I use mirrors to examine
3 the back of the nose, the nasopharynx, above the
4 back of the pallet and then the larynx and lower
5 part of the throat below the back of the tongue.
6            And then I examine the neck
7 usually by palpation to determine whether there
8 are any enlarged lymph nodes and whether there is
9 any palpable disease in the major salary gland
10 and the thyroid gland. Nodules specifically.
11    Q. With regard to that physical
12 examination of the ear and the mouth, the ears
13 and the mouth and the nose, are there any
14 conditions that you're able to observe that can
15 be indicative or lead to high frequency
16 sensorineural hearing loss?
17    A. The only condition that I might find in
18 the ear canal or the middle ear would be the sort
19 of condition that I alluded to before,
20 specifically and most likely a chronic infectious
21 condition; mastoiditis, for example, or
22 cholesteatoma, which could over generally a long
23 period of time cause some high frequency hearing
24 loss but I'm not able to directly examine the
25 inner ear as part of the physical examination, so

Page 178

1  I would say that most patients whom I see with
2  high frequency sensorineural hearing losses have
3  a normal physical examination.
4     Q. Can someone who has a deviated septum
5  let's say, would that have any effect on high
6  frequency hearing loss?
7     A. No.
8     Q. How about if someone -- I believe you
9  noted before diagnosed with sleep apnea, how does
10 that affect sensorineural hearing loss?
11    A. It has no effect.
12    Q. Any problems one can have with their
13 tonsils, can that affect high frequency
14 sensorineural hearing loss?
15    A. No.
16    Q. In response to one of the previous
17 questions when we were talking about the graphs,
18 I had asked you if there was a particular pattern
19 on the graphs that would be indicative of
20 sensorineural high frequency hearing loss.
21 Similar to that question, would there be a
22 pattern, a typical pattern on a graph that would
23 be indicative of presbycusis or degenerative
24 hearing loss?
25    A. Yes. The hearing loss pattern that

Page 179

1  would be suggestive of degenerative change along
2  with the appropriate medical history to support
3  that would be a, what we call a sloping
4  sensorineural loss, in which the higher
5  frequencies are more affected than the lower
6  frequencies. In a rather linear fashion, so that
7  the higher the frequency tested, the greater the
8  hearing loss.
9     Q. In your opinion, how long does it
10 usually take for an individual who is exposed to
11 occupational noise on a daily basis to exhibit
12 signs of occupational hearing loss on an
13 audiogram?
14        MR. PERRY: Objection. Can you
15 read that back?
16        (Question read.)
17    A. That's a difficult question to answer,
18 because it depends to a considerable extent upon
19 the intensity of the noise exposure. A person
20 who is exposed to loud noise is going to require
21 much less exposure time than an individual who is
22 exposed to less intense noises, particularly on
23 an occasional basis. It could be for very
24 significant noise exposure, as little as a few
25 months. And possibly even less than that.

Page 180

1         Because the question that you
2  asked really is not a question regarding when
3  they're going to notice it, it's a question of
4  when it can be measured on a hearing test, and a
5  measurable hearing loss is going to be the case
6  possibly long before they notice any hearing
7  loss, in their normal life situations.
8     Q. All right.
9     A. Certainly in most of these individuals,
10 the exposure has been over a period of years, but
11 as we discussed before, much of the measurable
12 hearing loss occurs during the first decade.
13    Q. I only have a few questions left for
14 you today. I think we touched on this briefly
15 before. But with respect to if you had two
16 separate individuals who are exposed to the same
17 occupational noise of the same level, duration,
18 proximity, and they both began let's say the same
19 normal baseline of hearing, would they both
20 sustain the same magnitude of hearing loss over
21 the same period of time or is that more of an
22 individual thing?
23    A. They wouldn't necessarily sustain the
24 same degree of hearing loss because there are a
25 lot of variables. Again, getting back to one of

Page 181

1  your earlier questions, we were talking about the
2  OSHA standards. Of not more than eight hours of
3  exposure to 90 db. Well, that's a requirement
4  that's felt to protect perhaps 85 to 90 percent
5  of the workers but there is a smaller percentage
6  who will exhibit measurable hearing loss at less
7  intense and prolonged exposure levels.
8     Q. So there would be certain individuals
9  who would have a greater sensitivity to receiving
10 hearing damage?
11    A. Yes. There are considerable individual
12 variables.
13    Q. Are you aware of any AMA guidelines
14 that assess impairment ratings to individuals who
15 have suffered hearing loss?
16    A. Yes.
17    Q. How does that work generally? If you
18 could explain that to me.
19    A. The AMA guidelines focus on hearing
20 loss affecting the speech frequencies. Ranging
21 from 500 to 3,000 hertz. And the calculation of
22 hearing handicap uses a 25 db fence, so that any
23 loss from 0 to 25 decibels is not considered to
24 be a loss. Has to be above 25 decibels and the
25 AMA formula calculates hearing loss for a

Page 182

1  particular ear by averaging the pure tone
2  thresholds at 500, 1000, 2000 and 3,000 hertz,
3  subtracting 25 db from each of those thresholds,
4  and then multiplying the average by 1.5 percent.
5  The formula that I've just described is applied
6  individually on each ear and if a person has a
7  bilateral hearing loss, the less affected ear is
8  weighted I believe it's five times versus a
9  weight of 1 given to the more affected ear. So
10 that the calculation is weighted in favor of the
11 better hearing ear.
12     Q. And in preparing your reports following
13 seeing the plaintiffs/patients referred by Cahill
14 & Goetsch, were you asked to ascribe a disability
15 rating or impairment rating if applicable?
16     A. No.
17     Q. Do you recall if for any of the
18 patients/plaintiffs, if you did ascribe any
19 impairment or disability rating?
20     A. I don't recall for any of the patients
21 calculating a disability rating.
22     Q. Going back to the individuals who may
23 be more susceptible to sustaining a hearing loss
24 at lower decibel levels, is there any way of
25 predicting what individuals may be susceptible to

Page 183

1  that based on any audiometric testing?
2     A. No. I'm not -- I don't believe there
3  is any way of predicting which individuals are
4  going to be more affected by exposures to noise.
5     MR. SUTTON: I think this is
6  probably a good place to stop for today. I think
7  I've asked almost all of the general questions I
8  could have. I apologize for any time you spent
9  preparing for the individual files that we didn't
10 get to today. I wasn't sure as to how long that
11 would take.
12     MR. PERRY: You reserve your right
13 to continue this deposition for the individual
14 files and any other cases in the first two groups
15 that haven't been discussed.
16     MR. SUTTON: Right. I reserve
17 that right to continue the deposition. So we're
18 essentially suspending the deposition.
19     MR. PERRY: Attorney Sutton has
20 agreed to retain all the exhibits that have been
21 marked at today's deposition and provide me with
22 copies of all of the exhibits. With respect to
23 Exhibit 7, he's just going to get me a copy of
24 the first page but he'll give me complete copies
25 of all of the other exhibits marked today. Is

Page 184

1  that correct, Attorney Sutton?
2     MR. SUTTON: That is correct,
3  Attorney Perry.
4     MR. PERRY: Thank you.

6  (Time noted: 4:51 p.m.)

11        JOHN CAMERON KIRCHNER

13     SUBSCRIBED AND SWORN TO BEFORE ME,
14 the undersigned authority, on this
15 the     day of         , 2004.

can answer.

A. A high frequency hearing loss, which involves the frequencies beyond the speech range, may not be immediately apparent to the patient. As the hearing loss extends into the upper speech frequencies, even then the hearing handicap can be very subtle. The patients typically hear low sounds, low frequencies very well and may hear very well in conversation when there's no background noise, but when there is background noise, such as loud music or other people talking, then they begin to have more difficulty hearing, but they may not be aware of it for some time. They may just think that other people are mumbling or speaking too softly. So that it is conceivable that one could go for years without being clearly aware that they have a problem.

Q. Now, you said that that's conceivable. Would that be unusual for someone to go that long?

A. No, that would not be unusual at all.

Q. In the plaintiff, Richard Bourt's disclosure of expert witnesses you have been disclosed as an expert witness to testify at the trial of this matter and you have offered the opinion to Attorney Cahill in this April 6, 2004 letter that your opinion to a reasonable degree of medical certainty that

and assigning causality. There are some states, I believe, and testing centers that do factor in each correction but, again, that's not universally accepted.

Q. Now, in your own practice and your own opinion of what constitutes normal hearing for an individual of Mr. Fuda's age would the audiogram results from a "normal" individual, would it share the characteristic of a dip at the higher frequencies?

A. The changes attributable to --

MR. PERRY: Objection to the form. Dip as opposed to slope, but you can answer the question.

A. The changes attributable to age are normally characterized by a progressive increase in the hearing loss as one gets into the higher frequencies in contrast to noise-induced hearing loss in which the dip tends to be centered in the 3000 to 6000 Hz range.

Q. And your records indicate that your examination of Mr. Fuda took place on September 3, 2002; is that correct?

A. Yes.

Q. Did you have any discussions of any type about Mr. Fuda prior to your scheduled evaluation of

1           recess.)
2    DIRECT EXAMINATION
3    BY MR. SUTTON:
4           Q.  Doctor, how was Mr. Kiniry referred to
5    you?
6           A.  He was referred to me by the law firm of
7    Cahill & Goetsch.
8           Q.  And what was your understanding of the
9    purpose of that referral?
10          A.  The purpose was to assess his hearing,
11   come to a decision regarding the likely cause of the
12   hearing loss, make any indicated treatment
13   recommendations and provide a report.
14          Q.  Were you aware at the time of the referral
15   that Cahill & Goetsch represented Mr. Kiniry in
16   connection with possibly bringing a claim for
17   occupationally-induced hearing loss?
18              MR. PERRY:  Objection to form.  You
19   can answer.
20          A.  I believe that there was a concern about
21   occupational hearing loss and that if his hearing loss
22   was attributable to occupational noise, that they
23   might choose to represent him in a claim.
24          Q.  Were you provided with any medical records
25   or other documents relative to Mr. Kiniry before your

1   evaluating him?
2       A.   No.
3       Q.   And on what date did you evaluate him?
4       A.   August 27, 2002.
5       Q.   The file before you, is that your complete
6   file relative to Mr. Kiniry?
7       A.   Yes.
8       Q.   Would you mark that?
9               (Defendant's Exhibit 5, marked for
10                  identification.)
11      Q.   Did you have any discussions of any type
12  with anyone about Mr. Kiniry before your evaluation of
13  Mr. Kiniry?
14      A.   No.
15      Q.   Is the report contained in your file an
16  accurate copy of your report?
17      A.   Yes.
18      Q.   Did you take handwritten notes during your
19  evaluation of Mr. Kiniry?
20      A.   Yes.
21      Q.   Would you read those for the record,
22  please?
23      A.   The notes indicate that for a _few years_
24  hearing tests at his place of work have indicated a
25  hearing loss.  His girlfriend had also complained on

1  occasion that he had difficulty hearing and he had
2  noted trouble hearing background noise and had had to
3  elevate the volume on the television set. Both ears
4  seemed equally affected. There was no tinnitus or
5  dizziness. With regard to the broader otologic
6  history, he had had only one ear infection which had
7  occurred 10 to 12 years previously. He did not recall
8  having had any as a child. There was no history of
9  ototoxic drug exposure, itchiness of the ear canals or
10 family history of hearing loss. He had been working
11 for the railroad since 1967 in signal maintenance.
12 Where he had been exposed to the noise of trains going
13 by, a clacking noise that relays make, track equipment
14 including tampers and other track equipment that's not
15 specified here. He had worn plugs on occasion for
16 about 10 years. His work week was from Monday through
17 Friday from 7 to 3 p.m. His last noise exposure was
18 two days prior to his visit with me. In terms of
19 prior work he indicated that he had served in the Navy
20 for four years from 1963 to 1967 as a barber. There
21 was no history of recreational shooting. Under the
22 review of systems there was no history of allergic
23 rhinitis, cardiopulmonary disease, high blood
24 pressure, diabetes mellitus, thyroid dysfunction. He
25 was on no regular medications, but would use Aleve as

1  needed for any soreness he might have. He had not
2  smoked for 15 years, but previously smoked two packs
3  of cigarettes per day for over 20 years. He had not
4  consumed alcohol over the past 20 years, but had drunk
5  heavily before that. Under physical examination there
6  was a thin layer of dry, dark debris in the right ear
7  canal and over the surface of the eardrum. This was
8  removed. The eardrum was otherwise normal. A
9  moderate amount of pale disclamated debris was removed
10 from the left ear canal but not from the tympanic
11 membrane itself. The eardrum was normal and the Rinne
12 was positive bilaterally. The septum was somewhat
13 full anteriorly. The inferior turbinates were normal.
14 The palate was moderately low lying. The nasopharynx
15 could not be well visualized. The hypopharynx was
16 normal. The vocal cords could not be seen. His neck
17 examination was normal. Notation about an audiogram
18 and finally under recommendations hearing protection,
19 question of a hearing aid evaluation and re-check in
20 one year.
21      Q. You note in your handwritten notes and
22 also your report that Mr. Kiniry told you that hearing
23 tests performed at his work over the past few years
24 have reportedly demonstrated some hearing loss. Do
25 you recall if he advised you that contemporaneous with

Page 262

1  those tests he realized he was having difficulties
2  hearing?
3       A.  Well, he only indicated to me that it was
4  a year or two that he had actually noticed the problem
5  himself.
6       Q.  That he noticed the problem himself or
7  noticed it --
8       A.  In terms of symptoms.
9       Q.  -- or noticed -- withdrawn.  That he
10 noticed hearing difficulty himself or hearing
11 difficulty in specific situations.
12      A.  Well, both would be true, that he noticed
13 difficulty hearing in certain situations.
14      Q.  Did he bring copies of the hearing tests
15 that were performed at his work with him to his
16 evaluation with you?
17      A.  No.
18      Q.  Could the one ear infection that he
19 sustained approximately 10 to 12 years ago have any
20 lasting effect and contribute to the present state of
21 his hearing difficulties?
22      A.  Ear infections do not normally cause
23 permanent hearing loss so I do not believe that his,
24 that the one infection, which he cited, contributed to
25 his present hearing loss.

Page 263

1    Q. With regard to the debris that you removed
2 from inside his right and left ear canals, what
3 effect, if any, would that have had on his day-to-day
4 hearing prior to your removing that material?
5    A. Very little, if any, effect.
6    Q. You also note that his septum is full
7 anteriorly. Does that have any effect on his hearing
8 difficulties?
9    A. No.
10   Q. How about the fact that he possesses a
11 moderately low lying soft palate? Does that have any
12 effect on his present state of hearing?
13   A. No.
14   Q. You note in your report that he is a
15 borderline candidate for amplification of one or both
16 ears. In your opinion was that necessary --
17 withdrawn. In your opinion did the plaintiff require
18 hearing aids for one or both of his ears?
19         MR. PERRY: Objection to form. You
20 can answer the question.
21   A. I do not believe that he required a
22 hearing aid for one or both ears.
23   Q. Did you suggest that he undergo an
24 evaluation of -- withdrawn. Did you suggest that he
25 undergo an evaluation to determine if hearing

1  amplification was right for him?
2           A.  I do not believe that I specifically
3  suggested it.  My note indicates or suggests that I
4  probably talked about it with him, that he could
5  consider doing it and that the decision as to whether
6  to proceed with such an evaluation would be based on
7  the degree of handicap he perceived and that's what I
8  would have spoken with him about.  But in my own
9  thinking it would have been based not only on his
10 symptoms, but also on the hearing loss pattern.  In
11 the right ear, for example, his hearing through 3000
12 Hz is in the normal range.  Hearing aids are not
13 really indicated for hearing losses which do not
14 affect the 3000 Hz range and often people who have
15 normal hearing through that range in one ear will
16 experience only modest handicap if the other ear is
17 affected at the 3000 Hz range and that was the case in
18 this situation hence my conclusion that he was
19 borderline.  I suspect I spoke with him about the
20 option of doing it, but did not specifically recommend
21 it.
22          Q.  Are you aware if he's pursued that at all?
23          A.  I do not know whether he has pursued it.
24          Q.  You further recommend that he undergo a
25 repeat hearing test in one year.  Do you know if he