1   regarding whether these individuals would be included
2   amongst the others in this case would be contingent
3   upon my medical evaluation and opinion.
4        Q.   Were you told that at any time by either
5   Mr. Cahill Mr. Goetsch or Mr. Perry?
6        A.   I was not specifically told that, no.
7   They were sent to me to do the evaluation and make
8   appropriate recommendations as well as providing a
9   report, but my understanding would be that if my
10  conclusions were at variance with their conclusion,
11  that they would not proceed with legal action.
12       Q.   Aside from your notation in your report on
13  the second paragraph that the plaintiff had been
14  exposed to the noise of passing trains, relays and
15  track equipment, did you discuss his noise exposure in
16  any more specific detail, his occupational exposure?
17       A.   No.
18       Q.   So I take it you didn't talk about his
19  time-weighted exposure to railroad machinery or
20  equipment?
21       A.   That's right.
22       Q.   Do you feel that there are any
23  non-occupational things that contributed to the
24  plaintiff's hearing difficulties presently?
25       A.   At the age of 57 there could conceivably

Page 268

1   be some contribution to the high frequency loss based
2   on degenerative changes. I would not be able to
3   include that there were any other significant
4   contributing factors.
5           Q.  Do you feel that advanced age contributed
6   at all to the plaintiff's present hearing
7   difficulties?
8           A.  I feel that his age could have contributed
9   modestly to this high frequency hearing loss.
10          Q.  Aside from your evaluation of Mr. Kiniry,
11  your education, training and experience, did you rely
12  on any other or anything else rather in reaching your
13  opinion that the plaintiff is suffering from noise
14  induced sensorineural hearing losses?
15          A.  No.
16          Q.  Did the plaintiff indicate to you any
17  hobbies or recreational activities that could have
18  contributed to his present hearing difficulties?
19          A.  No.
20          Q.  What did the plaintiff tell you about the
21  availability of ear protection at his job?
22          A.  He indicated that hearing protection
23  equipment was available and that he had been using it
24  on an occasional basis for 10 years.
25          Q.  Aside from saying he used it occasionally



Page 269

1  did he get any more specific with you about how
2  frequently he would use it?
3       A.  No.
4       Q.  Aside from what the plaintiff told you
5  about his occupational noise exposure -- withdrawn.
6  Were you aware that the plaintiff was exposed to M-14
7  fire while he was in the Navy?
8       A.  No.
9       Q.  Would that exposure have any effect on
10 your present opinion relative to your diagnosis of the
11 plaintiff's hearing difficulties?
12      A.  Depending upon the degree of exposure then
13 indeed exposure to gunfire could have also played a
14 contributory role.
15      Q.  Putting aside the plaintiff's exposure to
16 occupational noise during his career on the railroad,
17 his audiogram, as you took it in 2002, would those
18 results be consistent with someone who was 57 years
19 old and has been exposed to gunfire in the past?
20      A.  Given adequate exposure to gunfire, the
21 combination of age and gunfire exposure could produce
22 a hearing loss pattern like this.  The critical
23 element really is how much gunfire was he exposed to
24 and was there any other noise exposure, which could
25 contribute to this.  These hearing loss patterns are

1    very strongly suggestive of noise exposure.
2        Q.  What would the minimum firearm exposure be
3    that would lead you to accept that and old age as a
4    cause of audiogram results such as the one before you?
5        A.  It's hard to give an exact figure.  My
6    opinion would be that to produce a hearing loss
7    pattern like this he would have had to have been
8    exposed to hundreds if not thousands of rounds of was
9    it M-14?
10       Q.  M-14.
11       A.  M-14 fire.  And indeed I did ask him while
12   he was in the Navy about the nature of his service and
13   what he indicated to me was that his primary role
14   while in the Navy was as a barber where he would not
15   have been exposed to much noise.
16       Q.  I think that's all I have for Mr. Kiniry
17   at this time.
18   CROSS-EXAMINATION
19   BY MR. PERRY:
20       Q.  With respect to Mr. Kiniry, Doctor, do you
21   have an opinion within a reasonable degree of medical
22   certainty as to whether or not his hearing loss is
23   permanent?
24       A.  Yes.
25       Q.  What's your opinion?

1         A.   My opinion is that his hearing loss is
2    permanent.
3         Q.   Do you have an opinion, Doctor, within a
4    reasonable degree of medical certainty as to whether
5    or not Mr. Kiniry's hearing would be better today had
6    he not been exposed to noise on the railroad?
7         A.   Yes.
8         Q.   And what is your opinion?
9         A.   My opinion is that his hearing would
10   indeed be better today had he not been exposed to
11   noise while working for the railroad.
12        Q.   Break?
13             (Whereupon, there was a brief
14             recess.)
15   DIRECT EXAMINATION
16   BY MR. SUTTON:
17        Q.   Next is Mr. John Raggi, R-A-G-G-I.  How
18   was Mr. Raggi referred to you, Doctor?
19        A.   He was referred to me by the law firm of
20   Cahill & Goetsch.
21        Q.   And what was your understanding of the
22   purpose of the referral?
23        A.   The purpose was to assess his hearing
24   loss, determine the likely causes, make any treatment
25   recommendations and send a report.

Page 310

Page 312

```
 1   A.  Yes.
 2   Q.  Thank you.
 3        Before we get to the plaintiffs
 4   that I just mentioned, counsel for plaintiff
 5   Thomas Kiniry handed me an updated medical
 6   report for Mr. Kiniry from your office.  Is
 7   this --
 8        MS. PARZYMIESO:  Let's mark this.
 9        (Defendants' Exhibit 9 marked
10         for identification.)
11   Q.  Dr. Kirchner, have you seen these two
12   pages that make up Exhibit 9?
13   A.  Yes.
14   Q.  And could you please tell me for the
15   record what this exhibit is?
16   A.  This exhibit represents a portion of
17   my file on Thomas Kiniry.  It includes the
18   complete office note from his visit on January
19   18 of this year.
20   Q.  So is that a new visit since you were
21   last deposed about your opinion of Thomas
22   Kiniry?
23        MR. PERRY:  Objection to form.  I
24   think there are many opinions that were given
25   during the course of the deposition of
```

3 (Pages 309 to 312)

)ERS, GALE & RUSSELL
203-624-4157

Page 313

Mr. Kiniry, so I would just object to the singular use of the word "opinion."
   A.  This does represent new information since I was deposed.
   Q.  Okay. And could you -- is this your handwriting that appears on pages 1 and 2 of this exhibit?
   A.  Yes.
   Q.  Could you please read your handwriting into the record just so we have it?
   A.  January 18, 2005. The note is written in the SOAP formality, S-O-A-P, and under S, which refers to subjective, "Hearing loss seems somewhat worse than two years ago. Describes increased hearing loss, temporarily consistent with TTS," means temporary threshold shift, "for possibly several hours after exposure to noise. Still working in signal maintenance. Generally does not use hearing protection devices. Last exposed to noise approximately 15 to 20 minutes ago. No itchiness."
       Under O, objective findings, "Right ear, moderate amount of nonobstructive cerumen removed. Tympanic membrane clear and mobile. Left ear, moderate to large amount of

Page 314

cerumen and desquamated debris removed. Nearly obstructive. Tympanic membrane clear and mobile. Rinne positive bilaterally. Audiogram: See report."
       Then under the heading A, for assessment, "Question, slightly increased hearing loss bilaterally since August of '02 audiogram (versus temporary threshold shift)."
       Then under that, under P, or plan, "Recommend use of hearing protection devices. Trial of amplification for left ear. Recheck hearing in one to two years."
   Q.  All right.
   A.  She does not have the updated hearing test.
       MR. PERRY:  There was another hearing test?
       THE WITNESS:  Yes.
       MR. PERRY:  I'll make a copy.
       MS. PARZYMIESO:  Can you just mark that 9A.
       (Defendants' Exhibit 9A marked for identification.)
BY MS. PARZYMIESO:
   Q.  Dr. Kirchner, we've just marked as

Page 315

Exhibit 9A for identification the audiogram that appears that you performed on Thomas Kiniry during his January 18, '05 visit; is that correct?
   A.  Yes.
   Q.  Okay. In your notes that you just read into the record, from the January 18, 2005 visit, you note that Mr. Kiniry was last exposed to noise "15 to 20 minutes ago." Did you find that significant to his diagnosis?
   A.  Yes.
   Q.  And how so?
   A.  Because exposure to loud noise can cause a temporary threshold shift. It can temporarily depress the hearing thresholds beyond the baseline level for periods of several hours after noise exposure.
   Q.  Okay.
   A.  The implication of that is that his hearing as tested on January 18 may have appeared worse than it actually would have had he been tested 18 to 24 hours after his last noise exposure.
   Q.  Okay. Is it then fair to say that an accurate comparison cannot really be made

Page 316

between the August -- or, I'm sorry, the January 18, 2005 audiogram to the August 27, 2002 audiogram?
   A.  Yes.
   Q.  Okay. Did your evaluation of Mr. Kiniry on January 18th, 2005, did that evaluation change your opinion or opinions of Mr. Kiniry's hearing loss in this matter?
   A.  No.
   Q.  Have you or do you intend to update your letter to Cahill & Goetsch discussing your opinion of Mr. Kiniry or opinions of Mr. Kiniry in this matter?
   A.  I have not been asked to do so and was not planning to do so.
   Q.  Okay. And I don't recall from Mr. Kiniry's records, but did you recommend amplification for him back in 2002?
   A.  In 2002, my comment was that he was a borderline candidate for amplification of one or both ears, suggesting that I may have discussed it with him but did not recommend it at the time.
   Q.  And are you recommending a hearing aid for him now?

Page 317

A. Yes.
Q. And why is that?
A. I recommended it this month because he was complaining of increased difficulty hearing relative to the complaints from August 2002.
Q. Okay. So that recommendation was based on what he told you about his condition versus what you noted in the audiograms of January 18th, 2005?
A. The recommendation is really based on both his complaints and the objective test results. There has to be some correspondence between what he's complaining of and objective data documenting a hearing loss, but because people's listening situations and life-styles vary, two people with equivalent hearing losses may experience different degrees of handicap.
    The fact that he was complaining of increased handicap during his more recent visit was what prompted the recommendation for a trial of amplification.
Q. You mention in your notes that there was some debris removed from his ears. Did you find that significant to your diagnosis of hearing loss?

Page 318

    MR. PERRY: Are you asking about the January 18th notes of 2005?
    MS. PARZYMIESO: Yes.
A. The cerumen accumulation may have contributed to some of the hearing loss he was experiencing subjectively. It wouldn't have affected the effects -- it wouldn't have affected the results of the hearing test because the hearing test was performed after the ears were cleaned.
Q. And the fact that he had debris removed from his ears on January 18, 2005, did that affect your opinion or opinions as it relates to Mr. Kiniry in this matter?
A. No.
Q. I'd like to discuss with you, Dr. Kirchner, Mr. Compo's records first. May I look at your file and see what you've brought?
    (Document handed to attorney.)
    MS. PARZYMIESO: Can you mark this.
    (Defendants' Exhibit 10 marked for identification.)
Q. Dr. Kirchner, we've marked Samuel Compo's file that you've brought with you today

SANDERS, GAL
203-62

Page 331

1  machines?
2      A. Not in specific terms. He indicated
3  that he works along the tracks so that he's
4  exposed to this noise frequently, but I didn't
5  get a number of hours per day of exposure time.
6      Q. Did you ever obtain any noise level
7  testing results of the equipment he listed that
8  he's exposed to?
9      A. No.
10     Q. Did you ask Mr. Compo about any
11 hobbies that he's engaged in, past or present?
12     A. Yes.
13     Q. And what hobbies did he discuss with
14 you?
15     A. The only hobbies which I normally
16 inquire about when evaluating patients with
17 hearing loss are hobbies which would expose them
18 to loud noise levels. In this case, I inquired
19 about hunting and recreational shooting, which
20 he denied.
21     Q. All right.
22     A. I also asked about exposure to other
23 power equipment, and he indicated that he does
24 use a lawnmower.
25     Q. Did you ask him if he used hearing

Page 332

1  protection when he operated the lawnmower?
2      A. I don't believe I asked him that,
3  because most lawnmowers don't produce
4  sufficiently loud noise levels over the period
5  of time that they are used to cause significant
6  hearing loss.
7      Q. Okay. I think you said in your
8  handwritten notes that in August 2002, he had a
9  bad result on a hearing test? Did I hear you
10 right?
11     A. April 2002.
12     Q. April 2002.
13     A. About three months before his visit
14 with me.
15     Q. Did he bring a copy of those test
16 results with him?
17     A. No.
18     Q. You mention in your report that his
19 review of system is remarkable for
20 gastroesophageal reflux and elevated cholesterol
21 level. Are either of those conditions
22 significant to a diagnosis of high frequency
23 hearing loss?
24     A. No.
25     Q. What about cardiopulmonary disease,

Page 335

1  mention that over approximately the past year,
2  Mr. Compo has noticed difficulty hearing in
3  conversational settings. Now he was 44 years
4  old when he told you that. Is that uncommon for
5  a 44-year-old man to complain about problems
6  hearing in conversational settings?
7      A. Yes.
8      Q. Would it be unusual for a 44-old-man
9  without occupational exposure to noise to have
10 those same complaints?
11     A. Yes, it would be unusual.
12     Q. Ordinarily, in a situation where
13 someone is exposed to occupational noise, how
14 long does it take for high frequency hearing
15 loss to evidence itself in an audiogram?
16         MR. PERRY: Objection to form.
17         You can answer.
18     A. Well, it really depends entirely upon
19 the intensity of the noise exposure and its
20 duration.
21     Q. Okay.
22     A. Obviously the louder the noise, the
23 greater the duration of exposure, the more
24 quickly the high frequency loss will appear on
25 an audiogram.

Page 336

1      Q. You said Mr. Compo had been working at
2  Metro-North for 26 years but he had only been
3  noticing difficulty over the past year. Is that
4  unusual, when you're talking about
5  occupationally-related hearing loss?
6      A. Again, it depends entirely on the
7  circumstances. Given changing noise exposure
8  over the period of time of employment, it may
9  not be surprising. Even if the noise exposure
10 is constant over that time, that, too, is not
11 altogether surprising, because the high
12 frequency loss caused by noise exposure is not
13 detected initially by the patient.
14         The frequencies affected
15 initially are frequencies for the most part
16 which are above the speech frequency range so
17 that these people can go for years often with a
18 measurable hearing loss that is not noticed by
19 them. It may be noticed by other people but
20 possibly not by the patients, because some of
21 the frequencies are normal in many of these
22 cases. So that because they can hear some
23 sounds quite well, they may actually for long
24 periods of time deny that they have a hearing
25 loss.

9 (Pages 333 to 336)

Page 367

1   A. I live near the railroad, and the
2   track that goes by our house was all replaced,
3   the whole railroad bed was replaced three or
4   four years ago. It was done in the middle of
5   the night, and even though I live maybe a
6   hundred fifty or 200 yards, and had both our
7   storm windows and our inner windows closed when
8   this work was going on, it would wake me up
9   every night. The pounding and hammering and
10  diesel engine noise was unbelievably loud.
11      Q. So your statement then is based on
12  your own personal experience?
13      A. Yes.
14      Q. And not based on any literature that
15  you've reviewed or studies that you've done or
16  read about?
17      A. That's correct. It's based upon
18  personal experience.
19      Q. Okay. Do you feel that anything
20  nonoccupational may have contributed to
21  Mr. Russo's high frequency hearing loss?
22      A. Yes.
23      Q. Such as what?
24      A. I believe that there may have been a
25  contribution not only to the high frequency loss

Page 368

1   but to the lower frequency loss in each ear,
2   particularly the right ear, from familial inner
3   ear disease, and I conclude that based upon the
4   shape of the audiometric patterns and upon the
5   likely family history of hearing loss referred
6   to in my note about his maternal grandmother.
7       Q. I think you also said that someone
8   with Mr. Russo's experience on the railroad,
9   they may show high frequency hearing loss on an
10  audiogram as soon as a few years after being
11  exposed to the noise.
12          If a person -- if Mr. Russo had
13  audiograms performed throughout his career at
14  the railroads, and they did not show any hearing
15  loss, high frequency hearing loss, until after
16  about 20 years of working on the railroad, would
17  that affect your opinion on whether his hearing
18  loss was occupationally related?
19          MR. PERRY: Objection to form.
20          You can answer.
21      A. It would make me question the noise
22  exposure from year to year, yes. If I saw no
23  measurable hearing loss in the higher
24  frequencies 20 years after he started working
25  there, I would wonder how much noise he was

17 (Pages 365 to 368)

GALE & RUSSELL
624-4157

Page 425

2002?
A. I don't know whether he obtained another hearing test.
Q. Do you know if Mr. Black has any appointments scheduled to be seen by you again?
A. I'm not aware of any scheduled appointments.
Q. You also state in your report that the pure tone patterns are consistent with noise trauma. What does that mean?
A. Mr. Black has what many specialists in my field would consider to be classic patterns for noise-induced hearing loss. The predominantly affected frequencies are those in the three to six thousand hertz range, with relatively -- with relative sparing of the frequencies above and below that range.
     Although there are other possible causes of this type of hearing loss, the pattern is quite typical of noise-induced hearing loss, and upon seeing this sort of pattern, the first question that would come into my mind would be "Tell me about your noise exposure."
Q. So now what is your basis for saying that the pattern on the audiogram is classic of

Page 426

noise-induced hearing loss?
A. Again, it's the frequencies which are affected. In noise-induced hearing loss, the frequencies between three and six thousand hertz are affected more than the frequencies below and above that range, and that's in contrast to hearing loss caused by other disorders.
     So that, for example, degenerative inner ear disease tends to affect the higher frequencies more than the lower frequencies. In this case, the frequencies above 6,000 hertz are better, the acuity is better at those frequencies than at three to six thousand hertz. So that what we see on his hearing test is the notch-like pattern which is strongly suggestive of a history of noise exposure.
Q. I think what I want to know is, on what are you basing that, because there's a notch-like pattern, that equals or is indicative of noise-induced hearing loss? Is there a treatise that you're relying on? Is it based on experience?
A. Well, one has to correlate the audiometric findings with the history,

Page 427

obviously, of noise exposure over a period of time. And I base it also on my training and education and experience over 27 years, 28 years. There is an abundance of medical literature which describes a hearing loss pattern like this caused by noise exposure.
Q. Any literature in particular that you looked to in forming such an opinion?
A. Nothing that I -- There's no one or two articles. I mean, I -- over the years, I have read many, many articles and textbooks on hearing loss and patterns of hearing loss attributable to various causes. I can get references for you or look up the references if you wish.
     I did my residency at the Massachusetts Eye and Ear Infirmity, in Boston, Massachusetts, in otolaryngology, and our chairman there wrote a book entitled Pathology of the Ear, and in his book he has a chapter or a section in a chapter on noise-induced hearing loss, and that's maybe my initial introduction to the subject, but it's by no means the only reference that I have used over the years in learning about this subject.

Page 428

Q. Okay. Would such a hearing loss pattern as shown on Mr. Black's audiogram, would that be consistent with any other ailment, problem or cause?
A. There are other possible causes. There isn't a single other cause that I could point to. This would not, for example, be consistent with typical degenerative changes, typical ototoxic drug injuries, typical familial inner ear hearing loss patterns, but any one of them potentially could cause a hearing loss like this, even though it would be unlikely.
     MS. PARZYMIESO: Can you mark this letter as 13B.
     (Defendants' Exhibit 13B marked for identification.)
     13B    Letter dated 4/6/04 from      428
            Kirchner to Cahill.
Q. Dr. Kirchner, I've marked as Exhibit 13B a letter bearing your signature dated April 6, 2004, to Attorney Cahill at Cahill & Goetsch relating to your evaluation of Mr. Robert Black, and in your letter you state that "It is my opinion to a reasonable degree of medical certainty that occupational noise has